UNITED STATES of America, Plaintiff-Appellee,

v.

Antonio E. BASCARO, Patrick M. Waldrop, Russell Hobson, III, Manuel Eric Villanueva, Gustavo J. Fernandez, Manuel W. James, Defendants-Appellants.

UNITED STATES of America, Plaintiff-Appellant, Cross-Appellee,

v.

Manuel W. JAMES, Defendant-Appellee, Cross-Appellant.

Nos. 82–5547, 82–6043.

United States Court of Appeals, Eleventh Circuit.

Oct. 1, 1984.

Rehearings and Rehearings En Banc

Denied in No. 82–5547

Dec. 6, 1984.

---

Max B. Kogen, Loren Cohen, Miami, Fla., for Bascaro.

Albert J. Krieger, Miami, Fla., for Waldrop.

James M. Shellow, Steven M. Glynn, Milwaukee, Wis., for Hobson.

Weiner, Robbins, Tunkey & Ross, P.A., Geoffrey C. Fleck, Dean & Hartman, P.A., Miami, Fla., for Villanueva & Fernandez.

Ferdinand W. Bockelman, Dept. of Justice, Mervyn Hamburg, Washington, D.C., Appellate Sect./Crim. Div., Kenneth W. Sukhia, Kevin M. Moore, Asst. U.S. Attys., Tallahassee, Fla., for U.S.

Ron A. Dion, Atty., North Miami Beach, Fla., for Manny W. James.

Lehrman & Denker, Paul A. Lehrman, Tallahassee, Fla., for F. James.

Before HENDERSON and CLARK, Circuit Judges, and ATKINS *, District Judge.

CLARK, Circuit Judge:

Appellants were tried and convicted in the Northern District of Florida on drug conspiracy charges. Their convictions are founded upon a series of incidents taking place in 1977 and 1978, involving the importation of massive quantities of marijuana into the United States from Colombia, South America.[1]

---

* Honorable C. Clyde Atkins, U.S. District Judge for the Southern District of Florida, sitting by designation.

1. One co-conspirator who turned state's evidence estimated the quantity of marijuana imported during the time of his involvement with the defendants as between .75 and 1.5 million pounds.

Generally stated, the appellants, together with six other individuals (four of whom have either pled guilty or been separately tried and convicted, and two of whom remain fugitives), were charged in a thirty-count indictment in connection with their alleged involvement in a drug smuggling ring. Evidence adduced at trial indicates that appellants Bascaro and Villanueva, together with one Jose Acosta, who was separately tried and convicted, were the organizers and principal decision makers of the enterprise. Appellant Fernandez was responsible for overseeing the purchase of vessels to haul marijuana, and the hiring of crews to operate such vessels. Marijuana procured in Colombia and brought into the United States on board various vessels was purchased by appellants Hobson and Waldrop, among others, from an unindicted co-conspirator, Bill Cobb. Appellant James, an attorney, was the functional equivalent of "house counsel" for the group; James furnished legal advice, prepared documentation on fishing vessels owned by organization participants, and represented group members in criminal matters arising in connection with enterprise dealings.

James was convicted on one count only—conspiracy to possess marijuana with intent to distribute.[2] All other defendants were found guilty of conspiracy to violate the Racketeering Influenced and Corrupt Organizations Act (RICO)[3]; completed RICO substantive offenses[4]; conspiracy to import marijuana[5]; possession of marijuana with intent to distribute[6] (Bascaro—four counts; Villanueva, Fernandez and Waldrop—two counts; Hobson—one count); and with the exception of Bascaro, conspiracy to possess marijuana with intent to distribute.[7] In addition, Bascaro and Villanueva were convicted of engaging in a continuing criminal enterprise[8] and interstate travel in aid of racketeering enterprises,[9] and Hobson and Waldrop were convicted of importing marijuana.[10]

The appellants raise a myriad of issues on appeal, a number of which have been adopted by some or all defendants, and others that apply only to one or two defendants in particular. We shall first address those issues common to all or nearly all appellants.

## Common Issues

### I. In General—Marijuana Related Offenses as a Basis for Prosecution Under RICO

The Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, makes it unlawful to conduct or participate in the conduct of an enterprise affecting interstate commerce, through a pattern of racketeering activity, and also makes it a crime to conspire to do so. Racketeering activity is defined in terms of a laundry list of offenses, including "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in *narcotic or other dangerous drugs*, punishable under any law of the United States." 18 U.S.C. § 1961(1)(D) (emphasis supplied).

Joining appellant Hobson in his brief to this court is G. Robert Blakey, a professor of law at Notre Dame and a principal drafter of the RICO statute. Professor Blakey argues that marijuana offenses do not qualify as racketeering activity under RICO, because Congress did not intend the phrase "narcotic or other dangerous drugs" to include marijuana offenses. In support of his position, he points out that proposed drafts of the Act, listing marijuana in addition to narcotic and other danger-

---

2. 21 U.S.C. §§ 841(a); 846.

3. 18 U.S.C. § 1962(d).

4. 18 U.S.C. § 1962(c).

5. 21 U.S.C. §§ 952(a); 963.

6. 21 U.S.C. § 841.

7. 21 U.S.C. §§ 841(a); 846.

8. 21 U.S.C. § 848.

9. 18 U.S.C. § 1952.

10. 18 U.S.C. § 952(a).

ous drugs, were considered but ultimately rejected, and that in the federal wiretap statute, which Professor Blakey also had a hand in drafting, wiretaps were authorized for suspected offenses involving "narcotic drugs, *marihuana*, or other dangerous drugs." 18 U.S.C. § 2516(e) (emphasis supplied). Since Congress separately listed marijuana alongside narcotic or other dangerous drugs in the wiretap statute, its failure to do so in the RICO statute, the argument goes, reflects a congressional intent to exclude marijuana offenses from coverage under the Act.

 Our consideration of the appellants' argument is foreclosed by *United States v. Phillips*, 664 F.2d 971 (5th Cir. Unit B 1981). In *Phillips*, as here, it was argued that RICO did not apply to marijuana offenses. The holding in *Phillips* was explicit: "Marijuana may be the subject matter of a RICO charge," *Phillips* 664 F.2d at 1040. The appellants argue that *Phillips* is not controlling, because there, the basis for the defendant's claim was that marijuana is neither a narcotic nor a dangerous drug in fact, whereas here, the claim is grounded in legislative history and intent. However, the mere act of proffering additional reasons not expressly considered previously for accepting a particular statutory interpretation that has been explicitly rejected by a panel of our court, will not open the door to reconsideration of the question by a second panel. In short, *Phillips* held that marijuana *may* be the subject matter of a RICO charge; we are not at liberty to hold that it may not.

## II. Issues Relating to Matters Arising Prior to Trial

### A. The Wiretap

On January 5, 1979, Florida law enforcement agent Stephen Dobson applied for and received authorization from a Florida circuit court judge to intercept telephone conversations on two telephones listed to unindicted co-conspirator Bill Cobb, for a period of thirty days. Within that thirty-day period, Cobb had the numbers on both of his telephones changed; the telephone company refused to intercept the new numbers without new court orders, and so Dobson returned to court on January 15 and 29 and obtained amendments to the January 5 order, substituting the new numbers for the old. On February 2, 1979, Dobson applied for and was granted a thirty-day extension of the amended January 5 authorization, and it was during the extension period that certain telephone calls were intercepted incriminating several of the appellants.

### 1. Newly discovered evidence that the wiretap order was issued on the basis of false information

The appellants' initial challenge respecting the sufficiency of the wiretap application concerns what might best be termed "newly discovered evidence." Dobson's original affidavit relied in part upon information obtained from an informant, Rayburn Morgan. In the affidavit, Dobson alleged that he interviewed Morgan on December 5, 1978, and credits Morgan with having furnished certain details of Cobb's involvement in the marijuana conspiracy prior to July 1978.

In April 1983, several months after the conclusion of trial and while this appeal was pending, the defendants located Rayburn Morgan, and obtained his affidavit. Morgan stated that he did not make "many" of the statements attributed to him in the Dobson affidavit, and listed those statements with which he took issue. He added that he had reason to believe Cobb intended to kill him, for which reason he had been in hiding since the spring of 1978, and had made himself unavailable to all but the government prosecutors.

On the basis of this newly discovered evidence, appellants insist that the Dobson affidavit failed to establish the probable cause needed to authorize a wiretap on Cobb's phone. Consequently, appellants continue, this court should remand the case to the district court, presumably for a determination of whether a new trial is in order.

■ Evidence discovered post-trial, calling into question the existence of probable cause for a search conducted by law enforcement officers, is properly considered by the district court in a motion for a new trial pursuant to Fed.R.Crim.Pro. 33. *See, e.g., United States v. VanMaanen,* 547 F.2d 50, 52–53 (8th Cir.1976). Rule 33 provides, however, that where, as here, such a motion is filed with the district court during the pendency of an appeal, the motion may be denied but may not be granted without first having the case remanded by the court of appeals. *United States v. Fuentes-Lozano,* 580 F.2d 724 (5th Cir. 1978); *see generally* C. Wright, *Federal Practice and Procedure* § 557 (1982).

■ For our part, a court of appeals is without authority to rule on a motion for a new trial. *United States v. Boberg,* 565 F.2d 1059, 1062 (8th Cir.1977). We must nevertheless decide whether to remand the case for the limited purpose of having the district court entertain such a motion, and if remanding the case would serve no valid purpose, we will decline to do so. *United States v. Mack,* 695 F.2d 820, 823 (5th Cir.1983).

■ For the appellants to prevail in the district court on a motion for a new trial based upon newly discovered evidence, they must demonstrate, among other things, that the new evidence is such that it will probably produce an acquittal. *Bentley v. United States,* 701 F.2d 897 (11th Cir.1983); *United States v. Hirst,* 668 F.2d 1180, 1185 (11th Cir.1982). In order for such a result to be likely in this case, appellants must demonstrate, at the very least, that suppression of the wiretap evidence was warranted in light of information contained in Morgan's affidavit. Because we do not believe that the affidavit alone could properly result in suppression of the wiretap, it is unnecessary to remand the question to the district court for its consideration.

In *Franks v. Delaware,* the Supreme Court summarized the standard applicable for determining whether a defendant is entitled to a hearing upon his allegation that a search warrant was issued on the basis of a false affidavit:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, *if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.* On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing.

438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978) (footnote omitted) (emphasis supplied).

Assuming without deciding that Morgan's affidavit supports a claim of deliberate falsehood, and setting aside all references in Dobson's affidavit to the Morgan interview (which would be unnecessary even if everything in Morgan's affidavit was taken as true, given that Morgan makes it clear, at least by implication, that he does not question all statements attributed to him), the information remaining would still be sufficient to sustain a proba-

ble cause determination. In support of his application for wiretap, Agent Dobson furnished forty-six pieces of information tending to link Bill Cobb to an ongoing marijuana conspiracy. Of those forty-six items, only seven had any connection to Rayburn Morgan. The remaining thirty-nine detail the circumstantial evidence amassed pointing to the conclusion that Cobb was deeply involved in a drug conspiracy: a pattern of telephone calls to and from Cobb's residence to other suspected co-conspirators at times when marijuana smuggling ventures were coming to fruition; Cobb's purchase, ownership or use of several items of real and personal property employed by suspected co-conspirators to house and transport themselves and their marijuana; and details of an ongoing drug investigation in Maryland involving Cobb, among others, culminating in an arrest of several of the participants.

While no one item of information recounted above might have been sufficient standing alone to justify a wiretap order, taken together, they amply set out probable cause to believe that Cobb was involved in a marijuana conspiracy. Because probable cause to issue the wiretap order existed irrespective of information allegedly obtained from Morgan, the statements credited to Morgan, whether true or false, could not alter the trial court's determination that probable cause existed to authorize a wiretap. We therefore find it unnecessary to remand the question to the lower court for an evidentiary hearing.

2. The initial wiretap application and the staleness of information supporting probable cause

The appellants' second objection to the wiretap is that the application for authorization was supported by stale information. It is their contention that even if Dobson's affidavit amply demonstrated Cobb's involvement in the conspiracy through June of 1978, it failed to provide probable cause to believe that he continued to be involved when the wiretap was authorized seven months later.

Information contained in Dobson's affidavit relating to Cobb's involvement in the conspiracy after June, 1978, is as follows: The affidavit indicated that from July through November 1978 a consistent pattern of telephone calls continued to be made from Cobb's telephones to persons previously linked to the conspiracy. In that time, Cobb changed his principal residence and telephone numbers several times, which Dobson indicated in his experience was a common practice of persons engaged in illegal operations, done in an effort to impede detection by law enforcement personnel. Finally, on November 24, a slip of paper was found in the pocket of one James Posey, at the time of his arrest in connection with a smuggling operation linked to the conspiracy previously connected to Cobb, on which was written Cobb's telephone number, and the message: "Bill called—emergency 1:30 (expletive deleted) panic."

■ It remains a fundamental principal of search and seizure law that information furnished in an application for a search warrant must be timely, and that probable cause must be found to exist "at the time the warrant issues." *United States v. Hyde*, 574 F.2d 856, 864 (5th Cir.1978). A warrant application based upon stale information of previous misconduct is insufficient, because it fails to create probable cause that similar or other improper conduct is continuing to occur. *United States v. Weinrich*, 586 F.2d 481, 491 (5th Cir. 1978).

■ No mechanical test exists for determining when information becomes fatally stale; rather, "staleness is an issue which must be decided on the peculiar facts of each case." *Hyde*, 574 F.2d at 865; *Weinrich*, 586 F.2d at 491.

In general, the basic criterion as to the duration of probable cause is the inherent nature of the crime. The circuits hold that where an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit

recites activity indicating protracted or continuous conduct, time is of less significance.

*Bastida v. Henderson,* 487 F.2d 860, 864 (5th Cir.1973). Protracted and continuous activity is inherent in large-scale drug trafficking operations. *United States v. Tehfe,* 722 F.2d 1114, 1119 (3d Cir.1983). In such cases, then, the staleness issue should be construed liberally. *Id.* at 1120.

 In light of the liberal treatment properly accorded the staleness issue in a large drug conspiracy operation such as this, evidence of Cobb's continued complicity in the marijuana conspiracy in the seven months preceding the application was sufficient to support a finding of probable cause to authorize the wiretap. While the telephone message from Cobb found in Posey's pocket, the calls made from Cobb's telephones, and changes in Cobb's address and telephone numbers are subject to an innocent interpretation when viewed in isolation, in light of the ongoing investigation and Cobb's preexisting involvement with the conspiracy, such additional circumstantial evidence lent adequate basis for a probable cause determination that Cobb remained a part of the conspiracy and that his telephone was being used in connection with that conspiracy at the time the wiretap application was submitted. *United States v. Todisco,* 667 F.2d 255, 258 (2d Cir.1981).

3. The amended wiretap application and its sufficiency under federal and state law

The appellants' final objection to the wiretap concerns the sufficiency of the January 15 and 29 applications for amendment of the January 5 authorization order. They argue that the amendment applications violated Florida law, in that they improperly incorporated by reference documents relating back to the original January 5 application.[11]

Before the January 5 order had been acted upon and the wiretap was in place, Cobb had one of his telephone numbers changed. Consequently, on January 15, Dobson returned to the circuit judge who had issued the original order, and applied for an amended order reflecting the new telephone number. In his affidavit in support of the application for amendment, Dobson attached a copy of the original wiretap order, incorporated it by specific reference, and explained why that order needed to be amended. The court thereupon issued the amended order. A nearly identical sequence of events occurred later in the month: Cobb had the number on his second telephone changed, Dobson returned to court on January 29 with an application to amend the January 5 order, and the court amended its order accordingly.

 The first question to be answered is whether federal or state law governs a federal district court's ruling in a federal drug conspiracy case on the sufficiency of a wiretap application approved by a state court and submitted by a state law enforcement agent. Both the United States and the state of Florida have enacted wiretap authorization statutes. *See* 18 U.S.C. § 2510 *et seq.;* FSA §§ 934.01 *et seq.* Title 18 U.S.C. § 2516(2) provides in pertinent part:

The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter *and with the applicable State statute* an order authorizing, or approving the interception of wire or oral communications by investigative or law en-

11. To the extent that the amendment application cannot "piggyback" on the original, appellants make the related argument that the

amendment was not properly authorized, in that only the original was officially approved by an appropriate state official.

forcement officers having responsibility for the investigation of the offense as to which the application is made ...

(emphasis supplied). Two courts of appeals have expressly held that the federal statute requires federal courts to defer to state law on the question of the validity of wiretap orders obtained in state court by state law enforcement agents, to the extent that state requirements are the more rigorous. *United States v. McNulty,* 729 F.2d 1243, 1264 (10th Cir.1984) (en banc); *United States v. Marion,* 535 F.2d 697 (2d Cir. 1976). In *United States v. Nelligan,* our court tacitly approved "the Second Circuit's conclusion that state law governs the validity of state warrants issued by state courts" as an exception to "the general rule that federal law governs the admissibility of wiretap evidence in federal criminal cases." 573 F.2d 251, 254 (5th Cir. 1978). We agree with the interpretation given the statute by our brethren in the Second and Tenth Circuits, and therefore make explicit what was only implicit in *Nelligan:* that the requirements of state and federal law govern a federal district court's determination of the validity of wiretap warrants obtained by state law enforcement officers in state courts.

As previously noted, the state circuit court approved Agent Dobson's applications to amend the original January 5 wiretap authorization order, on the basis of affidavits that incorporated by reference the January 5 order and stated that an amendment to that order was necessary because the subject of the wiretap had changed his telephone number. The appellants do not suggest that this procedure would run afoul of federal law, but contend that it did violate the more rigorous Florida requirements. In support of their position, appellants have brought to our attention two Florida court of appeals decisions applying the state wiretap statute, and invalidating wiretap order amendment applications that incorporated by reference documents from the original application. *Bagley v. State,* 397 So.2d 1036 (Fla.App.1981); *Wilson v. State,* 377 So.2d 237 (Fla.App. 1979).

In both *Wilson* and *Bagley,* the original wiretap applications submitted by the state were sufficient in all respects and were properly approved. Among the requirements satisfied, was that the applicant furnish "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous"—a requirement common to the Florida and federal statutes. § 934.09(1)(c), Fla.Stats.; 18 U.S.C. § 2518(1)(c). Before the thirty-day time period on the original orders had run, the subjects of the wiretaps in *Bagley* and *Wilson* changed residence and telephone number, forcing the state to return to court with applications to amend the existing orders. In neither amendment application did the state reassert that other investigative procedures continued to be too dangerous or unlikely to succeed. Rather, they simply incorporated by reference statements to that effect from the original application.

The Florida courts of appeals held that the amendment applications were insufficient. The rationale for that conclusion, implicit in both opinions, is that when a suspect changes residence, the circumstances that previously made other investigative procedures dangerous or unlikely to succeed may no longer exist, thus requiring the state to assert new facts in its amendment application demonstrating that conventional investigative techniques continue to be dangerous or ineffective. As the *Bagley* court observed: "In the original application for wiretap, the affiant declared that it was difficult to surveil Bagley's residence because there were no positions the affiant could sit without being detected. The amendment makes no reference at all to the success or failure of the surveillance techniques employed at the new location. The amendment also fails to state why routine methods of surveillance could not be used at the new location." 397 So.2d at 1038.

Unlike the subjects of the wiretaps in *Bagley* and *Wilson,* Cobb changed only

his telephone number. As distinguished from a change in residence, a change in telephone number only could not conceivably have affected the efficacy of alternative investigative techniques. Nor in the context of this case could such a change call into question the continued existence of probable cause—to the contrary, in his initial application, Agent Dobson pointed to Cobb's frequent changes in telephone number as evidence of his continued involvement in illicit activities.

The foregoing comparison of *Bagley* and *Wilson* to the instant case leads us to conclude that Dobson's amendment applications were sufficient under Florida law. The naked formality of restating information in the amendment that would, in the context of this case, necessarily be identical in every respect to that presented one or two weeks before to the same circuit judge in the original application was not indispensable.

B. The Indictment

▆ Count V of the indictment provided in its entirety:

### COUNT FIVE

The Grand Jury further charges that:

Commencing during January, 1977 and continuing thereafter up to and including the date of the filing of this indictment, within the Northern District of Florida, and elsewhere, MANUEL ERIC VILLANUEVA, JOSE LUIS ACOSTA, MANUEL W. JAMES, GUSTAVO J. FERNANDEZ, CLIFFORD B. WENTWORTH, CARLTON C. REEVES, JAMES L. SELLERS, JOHN M. ARANEO, PATRICK C. WALDROP, RUSSELL HOBSON, and RENE BENITEZ, defendants herein, did unlawfully, willfully and knowingly conspire, combine, confederate and agree together, with each other and with divers other persons known and unknown to the Grand Jury, to distribute and to possess with intent to distribute, marihuana, a Schedule I controlled substance in violation of Title 21, United States Code, Section 841(a), all in

violation of Title 21, United States Code, Section 846.

The appellants' objection is that in the absence of more detailed factual allegations, Count V was constitutionally insufficient in that it failed to put the defendants on notice of the events giving rise to the crime charged. Along similar lines, the appellants complain that they had previously been tried with respect to the incidents forming the basis for the charge, but that the indictment was so unspecific that they were unable to formulate a coherent objection on double jeopardy grounds.

Defendants' contentions need not detain us long. In *United States v. Yonn*, our court conclusively resolved this very issue adversely to appellants:

To pass constitutional muster, an indictment must be sufficiently specific to inform the defendant of the charge against him and to enable him to plead double jeopardy in any future prosecutions for the same offense. (citation omitted). Those requirements are satisfied by an indictment that tracks the wording of the statute, as long as the language sets forth the essential elements of the crime. (citations omitted). In addition, "an indictment for conspiracy to commit a criminal offense need not be as specific as a substantive count." (citation omitted).

Against this background, the indictment here meets the test of specificity. Count II recites the essential elements of the offense charged against Sanes-Saavedra—knowingly conspiring to import a schedule I controlled substance into the United States, in violation of 21 U.S.C. §§ 952(a) and 963. It identified his alleged co-conspirators as well as the particular controlled substance. (citation omitted). The indictment also correctly set forth the time span of the conspiracy: from June 1, 1981 until the date of the indictment (November 24, 1981). (citations omitted). It further described the locale of the alleged conspiracy, at least partially, with the allegation that the criminal activity took place "in the

Northern District of Florida and elsewhere." Taken as a whole, these allegations adequately set forth the offense charged.

702 F.2d 1341, 1348 (11th Cir.1983).

## C. Impaneling of the Jury

### 1. The peremptory strike procedure

At the pretrial conference, the district court gave counsel for appellants a choice in the exercise of their peremptory challenges. Either they could exercise three challenges apiece without conferring among themselves prior to announcing the strikes each intended to make (for a maximum total of eighteen challenges, or a minimum of three, depending upon the extent to which the strikes overlapped), or they could collectively exercise fifteen strikes after consultation. Appellants chose the latter option and now contend that because the collective decision making process required lawyers-only conferences and decision making outside the earshot of their clients, the appellants were denied their right to be represented by counsel and to be present at a critical stage in the proceedings.

Rules 43 and 44 of the Federal Rules of Criminal Procedure embody a criminal defendant's rights under the sixth amendment to the United States Constitution to be present and to be represented by counsel at every stage of the proceedings against him, including the impaneling of the jury. Fed.R.Crim.P. 43(a), 44(a); *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970); *United States v. Chrisco,* 493 F.2d 232 (8th Cir. 1974). Those rights necessarily extend to that phase of the jury selection process involving the exercise of peremptory strikes. *Chrisco,* 493 F.2d at 236–37.

Rule 24(b) outlines the appropriate procedures for exercise of peremptory challenges:

If the offense charged is punishable by imprisonment for more than one year, the government is entitled to 6 peremptory challenges and the defendant or de-

fendants jointly to 10 peremptory challenges ... If there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly.

Fed.R.Crim.Pro. 24(b). The procedure utilized in the appellants' trial comported with Rule 24: the defendants were permitted jointly to exercise fifteen peremptory strikes—ten as a matter of right under the rule, and an additional five in the discretion of the trial court because there was more than one defendant involved. Appellants do not dispute this, but argue nevertheless that because the lawyers conferred among themselves outside the courtroom before exercising their peremptory strikes, their clients were simultaneously denied access to counsel and their right to be present.

We disagree. Nothing in the record suggests that counsel were rendered unable to confer with their clients in the course of the peremptory strike process. At the pretrial conference, the court told counsel that "I will give you an opportunity to confer among yourselves back in the back outside the hearing of everybody before you have to exercise your peremptory challenges," and at the voir dire, counsel took advantage of that opportunity. Nothing prevented counsel from speaking with their clients after they had conferred informally among themselves, before they made their strikes. Under these circumstances, we are unable to conclude that the appellants were deprived of their right to counsel. *United States v. Alessandrello,* 637 F.2d 131, 144 (3d Cir.1980); *Chrisco,* 493 F.2d at 237.

We likewise hold that the defendants were not denied their right to be present during the peremptory strike phase of jury selection. This case is quite close on its facts to the Eighth Circuit's decision in *United States v. Chrisco,* 493 F.2d 232 (8th Cir.1974). In *Chrisco,* the defendants were absent from the courtroom when their counsel informally conferred and made their peremptory strikes (a situation somewhat more troubling than in the in-

stant case, where the defendants were in the courtroom at all times, and counsel left briefly to confer). The *Chrisco* court nevertheless held that the defendants had not been denied their right to be present for the peremptory strike phase of the jury selection process, in light of the following facts: the defendants were in the courtroom when the voir dire questioning took place and again when the peremptory strikes were given actual effect by the clerk's reading off the list; the defendants had the opportunity to discuss their misgivings with counsel during or immediately following the impaneling process; and no objection was made at the time to the defendants' absence from the informal peremptory strike conference. For the same reasons, we conclude that the defendants were sufficiently present at the impaneling of the jury to satisfy the sixth amendment and Rule 43 of the Federal Rules of Criminal Procedure.

### 2. Sufficiency of the voir dire inquiry

The appellants' second attack upon the jury selection procedures employed in this case is directed at what they perceive to be an impermissibly brief and superficial voir dire examination conducted by the trial court. At the pretrial conference, the district judge informed counsel that he intended to conduct the voir dire himself, that counsel could submit questions they wanted asked, and that the court in turn would determine which questions were appropriate. (v. 29 at 16–17). Waldrop and Fernandez subsequently submitted lists containing 71 and 58 questions, respectively. (v. 9 at 2109–2112; 2173–2176). At the voir dire, the court posed twelve questions to the jurors, most if not all of which were among those requested by the defendants.[12] The appellants contend that the limited number of questions asked by the court precluded the defendants from rationally exercising their jury strikes, both peremptory and for cause.

Rule 24(a) of the Federal Rules of Criminal Procedure provides that:

The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors or it may itself conduct the examination. In the latter event, the court shall permit the defendant or his attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper.

■ In granting the district court latitude to ask or have asked such questions "as it deems proper," Rule 24 vests considerable discretion in the court to determine the appropriate method and scope of voir dire. *United States v. Brunty*, 701 F.2d 1375, 1378 (11th Cir.1983). That discretion, however, is not boundless:

We do not deem "as it deems proper" to give a trial judge unlimited discretion to ignore proposed questions nor to permit arbitrary refusal to put such questions.

We do not consider the court's obligation to let counsel, on request, get at underlying bases reflecting on bias, prejudice or other suspect factors to be discharged by general questions such as, "Is there any reason you cannot fairly and impartially try this case?" This obligation particularly would not seem to be discharged by general direct confrontation questions on human characteristics that most people are reluctant to admit they possess.

On the other hand, we do not mean to suggest that the same matter may be explored in numerous substantially similar questions, with tedious repetitions, of only slightly variant shadings of meaning. No hard and fast rules can be laid down, but the trial court within the general guidelines hereinbefore set forth

---

12. It should be added that a number of the proposed questions seeking general background information respecting the individual jurors

were answered by means of questionnaires filled out and returned by the venire.

must exercise its discretion so as not to block the reasonable exploration of germane factors that might expose a basis for challenge, whether for cause or peremptory. *United States v. Lewin,* 467 F.2d 1132, 1138 (7th Cir.1972); *see also United States v. Nell,* 526 F.2d 1223, 1229–30 (5th Cir. 1976). *Accord United States v. Ledee,* 549 F.2d 990, 993 (5th Cir.1977) ("Peremptory strikes are worthless if counsel is not afforded an opportunity to gain the necessary information upon which to base such strikes").

■ The appellants charge that the defendants were rendered unable to exercise rationally their jury strikes, because of the trial court's failure to pursue two crucial avenues of inquiry: juror bias toward marijuana, and juror prejudgment due to the enormous quantity of marijuana involved in this case. Contrary to the appellants' suggestion, the district court did inquire into juror bias toward marijuana, as follows:

THE COURT: All right. Now, as I have previously indicated to you, this case involves the alleged importation of marijuana. Marijuana and drug laws in this day and age are somewhat of a controversy. There are those individuals who think that the drug laws are too strictly enforced. There are also those individuals that think the drug laws are not strictly enough enforced.

Now, without asking whether you have any opinions concerning the drug laws, are there any of you that feel that, whatever your opinions may be, that it would influence your conduct in acting as a fair and impartial jury just because this is a drug case? Does everybody understand what I mean?

Are there any of you that feel so strongly about the drug laws that you do not feel that you could base your verdict solely on the evidence, the argument of counsel, and the charge that I will give at the conclusion as to the law that you must follow?

(v. 30 at 54–55).

In response to that question, one juror indicated that he "was going to try" to base his verdict solely on the evidence, but that it would be "a hard decision," because he disliked drugs "mighty hard." (v. 30 at 55–56). While no challenge for cause followed, the juror was subsequently removed by means of a peremptory strike. (v. 30 at 68). We are satisfied that the trial court's inquiry into the juror's bias toward marijuana offenses was sufficient to create "a reasonable assurance that prejudice would be discovered if present." *United States v. Nell,* 526 F.2d 1223, 1229 (5th Cir.1976).

■ Appellants further challenge the sufficiency of the voir dire because of the trial court's failure to inquire into potential juror prejudice against the defendants in light of the large quantity of marijuana involved. As noted earlier, during the pretrial conference the defendants were invited to submit questions for the court to ask prospective jurors; a total of 129 questions were later submitted. Not one of those proposed questions asked whether the jurors would be affected by the quantity of drugs involved in the case. We are satisfied that the general inquiry into the jurors' opinions respecting drug offenses was sufficient to disclose relevant prejudices, and that it was well within the trial court's discretion not to pursue the matter further with additional questions concerning the jurors' attitudes toward the quantity of marijuana at issue—especially in light of the fact that the defendants never requested that such a question be posed. *United States v. Eastwood,* 489 F.2d 818, 819–20 (5th Cir.1973) (general questions posed by the district court pertaining to juror bias sufficed for specific questions proposed by defendant but rejected by the court); *United States v. Desmarais,* 531 F.2d 632, 634 n. 4 (1st Cir.1976) (failure of defendant to request that specific questions be asked was relevant to a determination that the trial court did not abuse its discretion in failing to ask such questions).

3. The voir dire and defendants' presumption of innocence

■ As a final attack on the impaneling process, appellants challenge the trial

court's inquiries and admonitions concerning the purpose and effect of a grand jury indictment, as impermissibly stripping the defendants of their presumption of innocence, by suggesting that the indictment constituted a probable cause determination of guilt. Contrary to the appellants' claims, when the two questions and comments complained of are placed in context, the trial court's discourse with veniremembers served to protect rather than to threaten the defendants' presumption of innocence.

In both instances, the remarks at issue were preceded by a question from the court inquiring into whether any of the veniremembers had previously served on a jury. Answers were given indicating that certain individuals had served on grand juries, which prompted the court to respond with a follow-up question:

Has anybody else had any either grand jury or petty jury experience?

All right. Which leads me to the statement that I make now. Do any of you realize that, of course, the indictment in this case is not evidence of guilt and it only represents a finding that there is probable cause to believe that an offense has been committed by someone(?) Do each of you understand that?

All right. Do each of you understand that in our system the accused stands now before you innocent and remains so until proven guilty beyond a reasonable doubt? Do each of you understand that?

All right. Do each of you understand that the accused need not offer any evidence, need not testify, need not say a thing and that it is on the government to prove their guilt beyond a reasonable doubt? Do each of you understand that? Do each of you agree with that principal (sic)?

(v. 30 at 52–53). And again:

THE COURT: You were on a grand jury then. Do each of you understand the difference between a grand jury and a petit jury? Do each of you understand that a grand jury makes a finding of probable cause whereas a petit jury must be convinced by the evidence beyond a reasonable doubt before a conviction can be held(?)

(v. 30 at 70–71). Having evaluated the court's remarks in the context in which they arose, it is clear that the defendants' presumption of innocence and the government's burden of proof were left fully intact. *See United States v. Faulkner*, 488 F.2d 328, 330–31 (5th Cir.1974).

III. Issues Relating to Matters Arising at Trial

A. Closing Argument

The appellants challenge the italicized portions of the following excerpt from the government's closing argument, as improperly calculated to incite the passions of the jury and prejudicial to the defendants' right to a fair trial:

By your verdict today, by your verdict today or tomorrow, whenever you render that verdict, you will be serving the cause of justice. I am going to tell you, too, whatever the outcome is in this case, justice will have been served. I want to see justice done. I don't want to see convictions for the sake of convictions. I want to see that justice is done.

You go in there, follow the instructions of the law, apply it to the evidence in the case. Then justice will have been done. Justice will have been served.

*But you serve by your verdict, you serve as a conscience of this community. If you find that the government, by its evidence, has proved these defendants guilty beyond and to the exclusion of a reasonable doubt, then it's your duty to find these defendants guilty as charged. By that verdict, you will send out a very loud and clear message to other people of a similar persuasion that will traffic —*

MR. HARTMAN: Judge, I object.

THE COURT: Overruled.

MR. GEEKER: *—That would traffic in marijuana of these quantities,* that would engage in this kind of illegal activities. *You have heard and you're familiar by virtue of your own common*

*sense and experience with everyday affairs, the term, the war on drugs.*

*Isn't this case really one about a war? Haven't they invaded our shores?*

MR. HARTMAN: Objection.

MR. KRIEGER: Objection.

THE COURT: Well, the argument of counsel is in response to the defense lawyers' argument. The jury knows that the argument of counsel is not evidence. To that extent, they will disregard it.

MR. GEEKER: In any event, *there are tons and tons of marijuana brought into our communities here and dumped on our community.* This arena of justice, this court of law, is the place to decide whether or not this kind of activity is going to continue. Consider the evidence.

MR. DIAMOND: Continuing objection—

THE COURT: Overruled.

MR. DIAMOND: Continuing objection to that line of questioning.

THE COURT: Overruled.

MR. GEEKER: Consider your verdict based on the evidence, not what I argue. My argument is not evidence. But consider the evidence. If you consider the evidence and weigh it properly, then I am confident you will return a just verdict. Thank you.

(v. 43 at 293–95).

 In order for a claim of prosecutorial misconduct during closing argument to warrant reversal, the challenged remarks must be 1) improper; and 2) prejudicial to a substantial right of the defendant. *United States v. Kopituk,* 690 F.2d 1289, 1341 (11th Cir.1982). Upon evaluating the prosecutor's closing argument in light of the foregoing criteria, we hold that the challenged statements do not constitute reversible misconduct.

The statements of the United States Attorney that are complained of in this appeal, were made in rebuttal, following the closing arguments of the defendants. Among the closing arguments, and occupy-

ing thirty pages of transcript, was a self-described "drama" performed by counsel for James and beginning as follows:

This is a criminal trial. This is a big case for the government. That's what it was, folks. I didn't lie. It was a circus right from the beginning to the bitter end.

So allow me to indulge a bit in a little drama and tell you about Operation Sunburn.

Ladies and gentlemen, welcome to the Big Top, the Greatest Show on Earth, also known as Operation Sunburn. Accompany me. The drama is in three sections. Starring Mr. Nickolas Geeker, United States Attorney, as Mr. Nick the Ringmaster. Mike Moore as Mr. Mike, the Animal Trainer, and Assistant Ringmaster, Mr. Ken Sukhia, as the Young Circus Boy in Training. The Friendly Mr. Ferdinand Bockelman, the Paper Man Putting Posters Out to Welcome People to the Circus. And Scott Daniels, Assistant Animal Trainer and Keeper of the Zoo.

Act One. The circus comes to town. Well, Mr. Nick, we certainly have a good circus coming here. We've got a good show, got a lots of animals lined up for Mr. Mike. I got some great people some —rather, we've got them lined up. We are going to get that man on the high wire.

Who is that, says the Young Circus Boy. Who is that man walking on the high wire up there?

Well, this is Manny James.

Defense counsel's extended analogy of the government's conduct to a three-ring circus "was clearly an invitation to the prosecutor to protest to the contrary." *United States v. Eley,* 723 F.2d 1522, 1526 (11th Cir.1984). When the prosecutor goes no further than to take defense counsel up on his invitation, his conduct will not be regarded as impermissibly calculated to incite the passions of the jury. *Id.; see also United States v. Cotton,* 631 F.2d 63, 63–66 (5th Cir.1980). The United States Attorney's likening the drug problem to a war or

enemy invasion, coupled with his statement that he was interested in justice and not convictions for their own sake, could fairly be described as little more than a response to defense counsel's suggestion that the defendants' prosecution was a show put on by government counsel for their own amusement.

■■■■ Turning to the specific remarks complained of, prosecutorial appeals for the jury to act as "the conscience of the community" are not impermissible, unless calculated to inflame. *United States v. Kopituk*, 690 F.2d 1289, 1292–93; *United States v. Lewis*, 547 F.2d 1030, 1036 (8th Cir.1976); *United States v. Alloway*, 397 F.2d 105, 113 (6th Cir.1968). Nor is it impermissible "to simply compare the duties of citizens serving on juries with those of citizens serving in the armed forces." *Brooks v. Francis*, 716 F.2d 780, 789 (11th Cir.1983) (en banc pending). Finally, the prosecutor's reference to "tons and tons" of marijuana being "dumped" on the community was nothing more than a permissibly colorful way to describe a fact amply borne out in the record.

Because the remarks of government counsel are better understood as a response to the defendant's closing argument than as an attempt to inflame the jury, and because those remarks were not improper in and of themselves, reversal is unwarranted.

B. Ex Parte Communications Between the Judge and Jury During Deliberations

The jury commenced its deliberations at 9:50 a.m. on March 25. In the course of the day, the judge and jury exchanged several notes: (1) the jury requested an index of tapes played at trial, to which the court responded that no acceptable index existed; (2) the jury inquired as to a number of pages missing from the indictment, to which the court responded that the missing pages involved matters not relevant for the jury's consideration; (3) the jury requested transcripts of telephone conversations introduced into evidence by the prosecution and defense, to which the court responded that the jury already had transcripts of all telephone conversations introduced by the government, that some but not all of the telephone conversations introduced by the defense had been transcribed, and that to the extent the jury could not recall what it heard in the tapes that were not transcribed, it could request that any particular tape be replayed in open court; (4) the jury indicated that the tape transcripts were not in the jury room, to which the court did not respond. (v. 15 at 3455–62). The court went back on the record at 6:00 p.m., and in the presence of counsel stated:

I think we'll start tomorrow morning afresh, assuming they're not finished. I am confident they're not. But what I thought I would do is just send a note to them and ask them if they have arrived at any complete verdicts as to any defendants. Then find out yes or no. And then tell the marshal to bring them into the courtroom and bring with them only those verdicts, if any that they have arrived at as to any of the defendants. Is that fair enough?

(v. 44 at 68). Notwithstanding the concern of a number of defendants that such a note might be interpreted as coercive, the court sent the following message to the jury room: "Have you arrived at a unanimous verdict as to any defendant which you wish to report to me? Yes or no," to which the jury responded, "No, sir." The record reflects that the jury was returned to the courtroom at 6:11 p.m., at which time the court stated:

Members of the jury, I passed the note to you asking you whether you had reached a unanimous verdict as to any defendant, for the sole purpose of trying to give me some idea of how you were coming in your deliberations. I don't suggest that you should have reached a unanimous verdict as to any defendant. It occurs to me you have been here now over ten hours and you have had to digest a lot of things. And it further occurs to me that you probably won't be able to reach a verdict tonight as to any or all of the

defendants. And consequently, I am going to discharge you to the custody of the marshals for the remainder of the evening.

(v. 44 at 71–72).

After the jury had been excused, the court stated as follows:

While we are on the record and the jury is gone, have all counsel seen the notes that the jury has, the questions they have asked and the answers given? ... I didn't see any need in calling counsel on the questions that were asked. The main problem was, they couldn't find a piece—or some evidence. And the transcripts of the tapes.

(v. 44 at 72–73). Counsel for appellant James indicated affirmatively on the record that he had read the notes, and it can be assumed by the silence of the remaining counsel, who were present, that they had likewise read the notes. No objections were made at that time.

On March 26, two notes were sent from the jury to the court: one indicating that a verdict had been reached as to four of the six defendants, and the second stating that the jury was hung with respect to one defendant. At 4:45 that afternoon, the court went on the record to say that it had received the note indicating that the jury was hung, and proposed that an *Allen* charge, the so-called "dynamite charge," be given. Over objection, the jury was returned to the courtroom at 4:51, and the *Allen* charge was read. The verdict was returned approximately an hour after the jury had been returned to the jury room and recommenced deliberations.

■ With respect to the court's inquiry into whether the jury had reached a partial verdict as of the evening of the 25th, we find that no error was committed. The record clearly indicates that the communication was not undertaken until after counsel had been notified and had been given the opportunity to object. *United States v. McDuffie*, 542 F.2d 236, 241 (5th Cir.1976). Moreover, any coercive or otherwise improper impact the note might conceivably have had, was neutralized by the court's later remarks when the jury was returned to the courtroom.

■ The other communications undertaken on the 25th are somewhat more troubling. It is certainly true that preferable procedure would have been for the court to have informed counsel of communications from the jury and to afford them an opportunity to be heard before written responses were returned. *United States v. McDuffie*, 542 F.2d 236, 241 (5th Cir.1976). Nevertheless, counsel's failure to object to the ex parte communications at the time they were revealed may have operated as a waiver. Moreover, courts have universally held that where wholly innocuous inquiries of the sort at issue here are responded to by the court without first consulting counsel, any error thereby committed is nonprejudicial. *United States v. Reynolds*, 489 F.2d 4, 7–8 (6th Cir.1973); *United States v. Stone*, 452 F.2d 42, 48–49 (8th Cir.1971); *United States v. Goodman*, 457 F.2d 68, 72–73 (9th Cir.1972); *United States v. Freed*, 460 F.2d 75, 78–79 (10th Cir.1972). As the Fifth Circuit noted in *United States v. Breedlove*, 576 F.2d 57, 60 (5th Cir.1978), "when the judge's answer to the jury's inquiry was distinctly responsive to the question, it clearly stated the law, and no prejudice is shown, the error is harmless." *See also United States v. McDuffie*, 542 F.2d 236, 241 (5th Cir.1976). In this case, the court's answers were distinctly responsive to the jury's questions, and as such were at most harmless error.[13]

---

**13.** Counsel for Villanueva and Fernandez make reference to a note submitted by the jury to the court on the 26th stating: "We would like to go home and come back tomorrow." (v. 15 at 3467). In their brief, Villanueva and Fernandez assert that this note was submitted to the court without the knowledge of defense counsel before the *Allen* charge had been given and before a verdict had been reached. They argue that the effect of the *Allen* charge urging the jury to attempt to resolve their differences and reach a verdict, when the jury had expressed a desire to go home, was impermissibly coercive, but that because counsel were unaware of the jury communication, no objection was possible.

This argument is premised upon a blatant misreading of the record. The jury returned its

*Separate Issues*

I. Villanueva and Fernandez

A. The interview of Fernandez by a United States Attorney outside the presence of Fernandez's counsel.

 Prior to trial, with the knowledge and assent of Fernandez's attorney, a United States Attorney offered not to oppose Fernandez's motion to reduce bond, in return for the opportunity to speak with Fernandez privately, outside the presence of his counsel. Fernandez agreed. The government's objective was to investigate what was suspected to be the improper representation of Fernandez and James by their principal attorney, a suspicion subsequently confirmed, resulting in disqualification of the lawyer involved.

On the basis of this incident, Fernandez moved the district court to dismiss the indictment. The district court ruled that the communication was improper, but could be remedied by means less extreme than dismissal:

> Assuming the United States Attorney's behavior amounted to misconduct, the "remedies should be tailored to the injury suffered ...." *United States v. Morrison,* [449 U.S. 361, 364, 101 S.Ct. 665, 668], 66 L.Ed.2d 564, 568 (1981).... Fernandez complain(s) of two injuries. One is that the United States Attorney's actions poisoned their relationship with their lawyer. That complaint is mooted by their lawyer's disqualification. The other is that through his conversations with them the United States Attorney gained evidence and leads to even more evidence. The United States Attorney quite properly states he does not intend to introduce in his case in chief any evidence given him in the meetings and that the conversations were not used to obtain evidence. Even if, as defendants

allege, evidence were procured through the conversations, the prejudice can be cured by suppression of the evidence.

On appeal, Fernandez acknowledges that the Supreme Court's unanimous decision in *United States v. Morrison* explicitly held that absent demonstrable prejudice, dismissal of an indictment for violation of a defendant's sixth amendment rights is unnecessary. 101 S.Ct. 665, 449 U.S. 361, 66 L.Ed.2d 564 (1981). Inexplicably, however, Fernandez does not challenge the district court's conclusion that the potential for prejudice could be eliminated by means stopping short of dismissal, but instead is content to argue that the government's conduct requires per se dismissal. In effect, the appellant invites us to overrule Supreme Court precedent. We decline.

The agreement negotiated by the United States Attorney, wherein Fernandez was to barter his right to counsel in return for his freedom, constituted a coerced rather than voluntary waiver of the appellant's sixth amendment rights, and as such was wholly improper. *See Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). Nevertheless, we are in complete agreement with the district court that suppression of information obtained from Fernandez in defense counsel's absence assured that the government's misconduct would not prejudice the appellant in any way. Fernandez is unable to point to any evidence admitted at trial that was secured as a result of the improper interview. Accordingly, we affirm its ruling.

B. The sufficiency of the evidence supporting Villanueva's continuing criminal enterprise conviction.

 Under 21 U.S.C. § 848, a person who engages in a continuing criminal enterprise shall be sentenced to a term of impris-

---

verdict at 6:10 p.m. on March 26. (v. 44 at 80–88). At that point, the court informed the jury that it still had to decide whether certain pieces of defendants' property were to be forfeited to the government. On the record and in open court, the judge gave the jury the option of continuing on into the evening or returning in the morning, and the jury responded by way of

a note, that again was read in open court and on the record, saying that they would prefer to recess and return in the morning. (v. 44 at 88–89). Since the communication appellants complain of occurred with their knowledge, after the *Allen* charge had been read and the verdicts announced, and without objection, the appellants' argument is patently frivolous.

onment of ten years to life. A person is considered to have engaged in a continuing criminal enterprise if he violates any provision of 21 U.S.C. §§ 801 *et seq.* governing drug abuse prevention and control, in the course of a continuing series of like violations undertaken in concert with five or more other persons "with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management," as a result of which that person obtains substantial income or resources. Villanueva challenges his conviction under this statute, on the grounds that the evidence was insufficient to demonstrate that he was an organizer or supervisor of the enterprise. Viewing the record in the light most favorable to the government, we conclude that the evidence was sufficient to support Villanueva's conviction.

Evidence supporting Villanueva's continuing criminal enterprise conviction came largely from the testimony of two of Villanueva's former co-conspirators: Bill Cobb and Dan Abbey. Cobb testified that from the time of his first involvement in the conspiracy, Acosta, Bascaro, and Villanueva were the ones principally responsible for bringing marijuana into the United States. Cobb testified that Villanueva was involved in overseeing the purchase of suitable vessels, was present at storage sites when marijuana arrived, and participated in planning meetings. Cobb further testified that Villanueva furnished the money to purchase the properties where marijuana was stashed (v. 38 at 152–63); Villanueva together with Acosta were responsible for approving the sites where marijuana was to be offloaded (v. 38 at 183); and the enterprise deferred to Villanueva's judgment as to when the offloading was to occur (v. 38 at 195).

Abbey testified that the standard operating procedure of the enterprise was for him to collect the proceeds from various drug sales and turn them over to Villanueva and Acosta. (v. 40 at 15–17; 48–49; 57). Abbey further indicated that Villanueva was one of several members of the organization who would prepare the weight sheets, records reflecting the quantity of marijuana transferred to particular buyers. Weight sheets were reproduced in triplicate, and upon completion of a sale, one copy would go to the buyer, another would be retained by Abbey, and a third would be returned to either Acosta or Villanueva. (v. 40 at 42–44). At the conclusion of his direct examination, Abbey was asked to describe the various roles of the individuals about whom he had testified. He responded, without objection from defense counsel, that Villanueva "was in charge of the complete operation initially." (v. 40 at 65–66).

The foregoing testimony furnishes an adequate basis for the conclusion that Villanueva occupied a supervisory role in the conspiracy. Certainly the most conclusive evidence of this fact is Abbey's testimony that Villanueva was "in charge of the complete operation," and again that he was "the top man." (v. 40 at 65–94). Such conclusions were amply supported by Abbey's previous testimony concerning Villanueva's financial control of the enterprise. *United States v. Johnson,* 575 F.2d 1347 (5th Cir.1978).

C. Double jeopardy and Villanueva's convictions for both continuing criminal enterprise and underlying conspiracy counts.

In affirming Villanueva's continuing criminal enterprise conviction, we must simultaneously vacate his convictions on counts three and five for conspiracy to import and conspiracy to possess with intent to distribute marijuana, on double jeopardy grounds. The conspiracy provisions of the Controlled Substances and Controlled Substances Import and Export Acts proscribe conspiracy to commit any of the offenses defined in those acts. 21 U.S.C. §§ 846; 963. Similarly, the crime of continuing criminal enterprise, as defined in the Controlled Substances Act and construed by the Supreme Court in *Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), includes as one of its elements a conspiracy to violate the provisions of the Controlled Substances or Con-

trolled Substances Import and Export Acts. 21 U.S.C. § 848(b). In other words, one cannot be guilty of continuing criminal enterprise without also being guilty of conspiracy—the latter is a lesser included offense of the former. *Jeffers; United States v. Michel,* 588 F.2d 986, 1001 (5th Cir.1979); *United States v. Graziano,* 710 F.2d 691, 699 (11th Cir.1983). Where, as here, a defendant is convicted of engaging in a continuing criminal enterprise as well as the lesser included offenses of conspiracy to import and conspiracy to possess with intent to distribute marijuana, the proper remedy is to vacate both the convictions and sentences of the lesser included conspiracy offenses. *Graziano,* 710 F.2d at 699.

## II. Hobson and Waldrop

Appellants Hobson and Waldrop argue that the evidence was insufficient to sustain any of their several convictions. Both Hobson and Waldrop were convicted of conspiracy and substantive offenses under the RICO statute, conspiracy to import and conspiracy to possess with intent to distribute a controlled substance, and possessing with intent to distribute and importing a controlled substance.

Hobson and Waldrop might best be described as preferred customers of the enterprise. They were marijuana buyers (v. 40 at 66), Waldrop was described as one of the organization's "best buyers" (v. 40 at 55), and it was estimated that the two of them had purchased marijuana from the organization on 25 or 30 occasions (v. 40 at 62). The closeness of the working relationship between Hobson, Waldrop, and the other members of the enterprise is evidenced by numerous instances of mutual accommodation. Waldrop was relieved of his obligation to pay for 750 pounds of marijuana that Waldrop claimed was bad (v. 40 at 25), Waldrop and Hobson advanced money to the other members of the enterprise as a deposit on an incoming marijuana shipment (v. 38 at 187, 220–22), and at Hobson's instigation, a second attempt was made to import marijuana by plane follow-

ing the failure of an initial attempt (v. 38 at 222–23).

Hobson and Waldrop's convictions arose out of their involvement in two smuggling ventures: the "Tallahassee warehouse" and "Constellation" episodes. The Tallahassee warehouse episode involved Waldrop but not Hobson. In April 1978, a warehouse in Tallahassee, Florida was leased in anticipation of the arrival of a double load, or 80,000 pounds, of marijuana. The load arrived in late April, of which 40,000 pounds was set aside for Waldrop; for reasons that were never explained, however, Waldrop was late in picking the load up. (v. 40 at 52–53). On April 26, the Florida Department of Law Enforcement discovered the stash, and were at the warehouse conducting an investigation when Waldrop arrived in a rented car. (v. 31 at 85–90). Waldrop was stopped and questioned, and a consensual search of his briefcase yielded records of marijuana transactions. The records were seized, but Waldrop was released at that time. (v. 31 at 89–90).

The Constellation episode involved both Hobson and Waldrop. In January 1979, Cobb, together with Waldrop and Hobson, made arrangements for the delivery of a planeload of marijuana. (v. 38 at 186–87). Appellant James advised Cobb against embarking upon this particular venture, but agreed to stand by and provide Cobb with legal assistance if necessary. (v. 38 at 187–88). Waldrop made a down payment of $1,500,000 with the expectation that he and Hobson would receive the entire planeload of marijuana. (v. 34 at 165; v. 38 at 167; v. 40 at 55). The plan failed, however, when the plane was seized upon its arrival at the Ft. Lauderdale airport. Appellant James was called in to represent the parties arrested (v. 38 at 188), and Acosta interposed himself between Cobb and the Colombian sellers, who were blaming Cobb for the venture's failure (v. 39 at 118–19).

Waldrop and Hobson requested that Cobb either attempt a second airplane smuggling venture, or return their security deposit; Cobb agreed to a second attempt

on the condition that Waldrop and Hobson purchase most if not all of the shipment. (v. 38 at 221–23). In February 1979, a Constellation aircraft was flown to Colombia, and loaded with marijuana. Because of fog and engine problems, the craft was compelled to land in Panama City in lieu of the more clandestine site agreed upon, and federal agents were ready and waiting upon its arrival. (v. 32 at 132–40; 161–66).

A. Conspiracy to Import and Conspiracy to Possess with Intent to Distribute

Hobson and Waldrop insist that the record is devoid of evidence that they entered into a conspiratorial agreement with the other co-defendants; at best, they contend, the evidence indicates that they were merely buyers from and not members of the conspiracy.

In order for a defendant to be found guilty of conspiracy, the government must demonstrate that a conspiracy existed, that the defendant had knowledge of it, and that he or she voluntarily became a part of it. *United States v. Badolato*, 701 F.2d 915, 920 (11th Cir.1983); *United States v. Lippner*, 676 F.2d 456, 466 (11th Cir.1982). The existence of a conspiracy may be demonstrated by circumstantial evidence such as inferences from the conduct of the defendant or circumstances indicating a scheme or plan. The knowledge requirement refers simply to knowledge of the essential objective of the conspiracy; a defendant may be found guilty notwithstanding that he did not have knowledge of all the details of the conspiracy or played only a minor role in the total operation. *Badolato*, 701 F.2d at 918–20; *United States v. Corbin*, 734 F.2d 643 (11th Cir. 1984).

It is settled that the existence of a simple buyer-seller relationship alone does not furnish the requisite evidence of a conspiratorial agreement. *United States v. Braico*, 422 F.2d 543 (7th Cir.1970); *United States v. Watson*, 594 F.2d 1330, 1337 (10th Cir.1979); *United States v. Torres*, 503 F.2d 1120, 1123 (2d Cir.1974). It is equally well settled, however, that where a buyer knowingly assumes a role instrumental to the success of the conspiracy, the jury may properly infer that he is a member in it. *United States v. Apollo*, 476 F.2d 156, 162 (5th Cir.1973) (finding it unnecessary "to define precisely how limited purchases, in number or size, may be in such 'mere purchases' cases and still permit the intent to participate in an unlawful conspiracy to be inferred," because "in the present case, there was direct proof of a continuing relationship between Apollo and Cocroft, a known conspirator, which resulted on at least two occasions in the witting transfer of company marijuana to Apollo"); *United States v. Hess*, 691 F.2d 984, 988 (11th Cir.1982) (while a fence does not automatically become a conspirator by purchasing stolen property, fences are necessary to the success of a hijacking conspiracy, and a fence who holds himself out as a place to dispose of stolen goods is a conspirator).

In this case, it is clear that Hobson and Waldrop were more than "mere purchasers." They were among the selling group's best buyers, they purchased from the selling group on numerous occasions, and maintained a close relationship with the selling group. The success of the selling group's endeavors depended upon the participation and cooperation of Hobson and Waldrop: Waldrop's failure to pick up the marijuana from the Tallahassee warehouse as scheduled resulted in a delay that led to seizure of the shipment, and the success of the Constellation episode depended upon Hobson's and Waldrop's willingness to purchase a majority if not all of the marijuana load. Accordingly, we find the evidence more than sufficient to sustain the conclusion that Hobson and Waldrop had entered into a conspiratorial agreement with the other co-defendants.

Hobson and Waldrop further argue that regardless of whether their role as frequent buyers is sufficient to demonstrate their complicity in a conspiracy to possess marijuana, the evidence remained insufficient to support the inference that they had

knowledge that the marijuana was imported. Accordingly, they contend that their convictions for conspiracy to import cannot stand, because they had no knowledge of an essential objective of the conspiracy.

In order to be guilty of conspiring to import a controlled substance, in violation of 21 U.S.C. § 963, the defendant must have known that the substance was imported. *United States v. Steward*, 451 F.2d 1203 (2d Cir.1971); *Mason v. United States*, 383 F.2d 107 (10th Cir.1967). A defendant will not be held to have knowledge of an illegal importation solely on the basis of evidence that one or more of his alleged co-conspirators had ' such knowledge; nevertheless, direct or circumstantial evidence may justify an inference of knowledge. *Mason v. United States*, 383 F.2d 107 (10th Cir.1967).

Here, there is no question that marijuana was imported from Colombia, South America into the United States by means of boat and airplane. There is likewise no question that Hobson and Waldrop's co-defendants were aware that the marijuana was imported. In light of the massive quantity of marijuana involved, the frequency with which Waldrop and Hobson had occasion to deal with the other members of the enterprise, the fact that Hobson, Waldrop and Cobb were described as the principal organizers of the Constellation episode in which marijuana was to be delivered by airplane from Colombia to southern Florida, and the presence of both Hobson and Waldrop at various of the organization's stash houses on numerous occasions, the jury was warranted in finding that Hobson and Waldrop knew the marijuana was imported. *United States v. Corbin*, 734 F.2d 643 (11th Cir.1984); *United States v. Garcia*, 721 F.2d 721, 725 (11th Cir.1983).

## B. The RICO Offenses

Subsection (c) of 18 U.S.C. § 1962 makes it unlawful to conduct or participate, direct-ly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity. Subsection (d), in turn, makes it unlawful to conspire to violate the provisions of subsection (c).

Hobson was convicted of a substantive RICO violation pursuant to subsection (c), as well as a RICO conspiracy under subsection (d). The basis for Hobson's RICO convictions arose from his involvement in the Constellation episode in connection with which he was indicted and convicted of importation and possession with intent to distribute marijuana.[14] Hobson argues that these two convictions were the result of a single attempt on his part to procure marijuana, and that consequently he was not shown to have engaged or conspired to engage in a "pattern" of racketeering activity.

"Pattern of racketeering activity" is defined in 18 U.S.C. § 1961(5) as "at least two acts of racketeering activity" committed within a ten-year period. "Racketeering activity" is defined to include "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, or *dealing in narcotic or other dangerous drugs*, which is chargeable under state law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1) (emphasis supplied). The statutory definition of pattern of racketeering activity has been construed as follows:

> To be convicted of a § 1962(c) RICO charge, the evidence must show that the defendant participated in the affairs of the enterprise through a pattern of racketeering activity. This requires the commission of at least *two predicate crimes*.

*United States v. Welch*, 656 F.2d 1039, 1057 (5th Cir.1981) (emphasis supplied). Possessing and importing marijuana are two separate crimes and consequently two separate acts for purposes of the RICO

---

**14.** It may be recalled that Hobson was also convicted of conspiracy to possess and conspiracy to import, which would qualify as additional acts of racketeering under the Act; the indict-ment, however, limited the predicate acts alleged against Hobson under the RICO charges to the two substantive offenses.

statute. The appellants' suggestion that two predicate acts cannot have arisen out of a single transaction was expressly considered and rejected in *United States v. Phillips,* 664 F.2d 971, 1039 (5th Cir. Unit B 1981).

Waldrop's convictions under the RICO statute stem from his involvement in both the Tallahassee warehouse and Constellation episodes. The predicate acts of racketeering activity underlying the RICO counts included: possession of marijuana with intent to distribute, in connection with the Tallahassee warehouse venture; and importation and possession of marijuana with intent to distribute in connection with the Constellation venture.[15]

It is Waldrop's position that the Constellation venture was independently undertaken by Cobb, Hobson and Waldrop and was not an affair of the enterprise. If the predicate acts alleged in connection with Constellation venture are stripped from indictment on the ground that they were unrelated to the enterprise's affairs, only one predicate act remains—the possession of marijuana stored at the Tallahassee warehouse—which alone does not constitute a "pattern" of racketeering activity. In support of his position, Waldrop makes two related arguments. First, Waldrop assigns error to the district court's refusal to read Waldrop's requested instructions concerning the definition of the enterprise, and Waldrop's theory of defense. Second, Waldrop argues that the evidence does not support the conclusion that the Constellation venture was an affair of the enterprise.

At trial, Waldrop requested that the following instruction be read respecting the definition of the RICO enterprise in this case:

> In order to find defendant, Patrick M. Waldrop, guilty of Count 2, you must find that the government has proven, beyond a reasonable doubt that, the enterprise established by Manuel Eric Villanueva, Jose Luis Acosta and Antonio E.

Bascaro, as previously described, existed in fact, and that Mr. Waldrop knowingly and willfully participated in the conduct of this particular enterprise's affairs through a pattern of racketeering activity. In order to conclude that Mr. Waldrop participated through a pattern of racketeering activity, you must find that he committed at least two of the following acts and that they were in furtherance of the conduct of this particular conspiracy: (the three previously mentioned affirmative acts are then recited).

The district court rejected Waldrop's proposed instruction in favor of the following:

> Count 2 of the indictment alleges that from on or about January 1977 and continuously afterwards up to and including September 3, 1981, defendants Manuel Eric Villanueva, Antonio E. Bascaro, Manuel W. James, Gustavo J. Fernandez, Patrick C. Waldrop, and Russell Hobson were persons associated with an enterprise or an enterprise as defined by Title 18, United States Code, § 1961(4), that the enterprise engaged in or its activities affected interstate commerce and that the defendants knowingly and willfully participated in the enterprise's affairs through a pattern of racketeering endeavor in violation of Title 18, United States Code, § 1962(c).... Count 2 alleges that the enterprise consisted of a group of individuals associated in fact for the purpose of importing multi-ton quantities of marijuana into the United States from a place outside of the United States, possessing multi-ton quantities of marijuana with the intent to distribute and distributing within the United States, multi-ton quantities of marijuana, a Schedule I controlled substance. Now let me define some of the terms of this statute for you. The term enterprise, as used in the statute, includes any individual, partnership, corporation, association, or other legal entity and any group of individuals associated in fact, although not a legal entity.... In order to estab-

---

**15.** Like Hobson, Waldrop was also convicted on conspiracy charges, but again the indictment did not list those charges as predicate acts in the RICO count.

lish that any of the defendants named in Count 2 of the indictment committed the offense charged in that count, the government must prove as to that particular defendant each of the following elements beyond a reasonable doubt. First, that the defendant was associated with an enterprise as I have defined it for you. Second, that the defendant engaged in a pattern of racketeering activity as I have defined it for you by knowingly and willfully committing, or knowingly and willfully aiding and abetting at least two acts of racketeering activity as hereinafter explained. That at least two acts of racketeering activity occurred within ten years of each other, that one of such offenses took place after October the 10th, 1970, *that the offenses were connected with each other by some common scheme, plan or motive so as to constitute a pattern, and not merely a series of disconnected acts.* Fourth, that the commission of two or more connected offenses the defendants conducted or participated in the conduct of the enterprise. Fifth, that the enterprise engaged in or that its activities affected interstate or foreign commerce.

Waldrop argues that in defining the enterprise as a group associated in fact for the purpose of importing and possessing marijuana, the instruction delivered would lead the jury to find that any marijuana smuggling venture undertaken by one or more of the defendants would necessarily be a venture of the enterprise. Put another way, Waldrop contends that the enterprise was defined for the jury solely in terms of the racketeering activity it allegedly conducted, so that any conduct qualifying as an act of racketeering under the Act would be ascribed to the enterprise, regardless of whether independently undertaken, as Waldrop contends was the case with the Constellation venture. In Waldrop's view, the instruction he proposed avoided this pitfall by more precisely defining the charged enterprise in terms of its principal organizers.

Waldrop is quite correct that the existence of an enterprise is an element of a RICO violation distinct from the element of a pattern of racketeering activity in which the enterprise engages. *United States v. Phillips,* 664 F.2d 971, 1011 (5th Cir. Unit B 1981); *United States v. Lemm,* 680 F.2d 1193 (8th Cir.1982); *United States v. Anderson,* 626 F.2d 1358 (8th Cir.1980). We do not agree, however, that the instruction delivered would have the effect Waldrop suggests.

The district court described the enterprise in question in terms of a group of individuals defined to include Bascaro, Villanueva, James, Fernandez, Waldrop, and Hobson who were associated in fact for the purpose of importing, possessing and distributing marijuana. We do not believe that this instruction could be misunderstood to permit the jury to ascribe to the enterprise smuggling ventures independently undertaken by one or more of its members. The instruction permitted the jury to find that Hobson and Waldrop's activities with respect to the Constellation smuggling venture could be included among the overt acts of racketeering activity needed to establish a "pattern" under the RICO statute, only if such activity was associated with the affairs of the enterprise, defined in terms of all named defendants and their common purpose. The court's refusal to read Waldrop's proposed instruction, therefore, was not fatal.

Waldrop further argues that even if the court's instruction was proper, it was error not to recite Waldrop's theory of defense. Waldrop's proposed instruction stated as follows:

Mr. Waldrop's theory of the defense is that he must be acquitted of the charges contained in Count 2 of this indictment, because the government has not proven, beyond a reasonable doubt, the following: (1) that he knowingly or willfully participated, directly or indirectly, in any enterprise established by Manuel Eric Villanueva, Jose Luis Acosta, and Antonio E. Bascaro through a pattern of racketeering activity; (2) that the evidence

fails to establish that he committed two acts of racketeering which were connected, directly or indirectly, to the enterprise established by Manuel Eric Villanueva, Jose Luis Acosta, and Antonio E. Bascaro.

A district court's refusal to deliver a defendant's requested instruction will constitute reversible error "if and only if the requested instruction (1) is correct, (2) is not substantially covered by other instructions which were delivered, and (3) deals with some point in the trial so 'vital' that the failure to give the requested instruction seriously impaired the defendant's ability to defend." *United States v. Stone*, 702 F.2d 1333, 1339 (11th Cir.1983). We are satisfied that the requested instruction was substantially covered by other instructions delivered. The only difference between the "theory of defense" instruction requested and the instruction given was that the instruction given defined the enterprise in terms of its participants and purpose instead of its organizers, which for reasons given above is not a difference so vital as to impair the defendants' ability to defend under the instruction delivered.

We are further satisfied that the evidence supported the jury's finding that the Constellation episode was an affair of the enterprise and not a free-lance smuggling venture. The venture was headed by Cobb, a self-described leader of the enterprise. James was called upon to serve as counsel to the participants, just as he had been with virtually all of the affairs of the enterprise. Finally, Acosta assumed responsibility for the venture by stepping in to rescue Cobb after the venture had failed. Viewing the record in a light most favorable to the government, we hold that the above-mentioned facts could combine to lead a reasonable juror to conclude that the Constellation venture was an affair of the charged enterprise.

C. Importation and Possession of Marijuana with Intent to Distribute

The gist of Hobson and Waldrop's contention with respect to the possession and importation counts is that they never had constructive or actual possession of the marijuana, nor were they physically responsible for the importation. Hobson candidly acknowledges that to the extent he is linked to a conspiracy to possess or import, he may be found guilty of the completed acts of possession and importation notwithstanding that he did not physically commit them. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). He points out, however, that before a defendant may be convicted of substantive offenses on the basis of acts committed by his co-conspirators, a jury instruction outlining that basis for liability must be given. *United States v. Monaco*, 702 F.2d 860, 881 (11th Cir.1983). Inexplicably, the government did not request and the district court did not deliver a *Pinkerton*-type instruction. The court did, however, instruct the jury that a defendant would properly be found guilty of a substantive offense were he to aid or abet another in its commission.

Hobson and Waldrop's convictions for possession of marijuana with intent to distribute must be upheld if the evidence is sufficient to sustain the finding that they had either constructive or actual possession, or that they aided and abetted another who had constructive or actual possession. We have little trouble holding that Waldrop had constructive possession over the marijuana seized at the Tallahassee warehouse. "Constructive possession consists of the knowing exercise or the knowing power or right to exercise dominion and control over the substance." *United States v. Knight*, 705 F.2d 432, 433 (11th Cir.1983). Testimony adduced at trial indicated that 40,000 pounds of the Tallahassee warehouse load was set aside for Waldrop; that Waldrop personally stacked a number of bales and set them aside with the intent to pick them up later; and finally, that he was stopped by law enforcement agents upon his return to the warehouse. Taken together, these facts amply demonstrate that Waldrop exercised dominion and control over the marijuana in question.

With respect to the Constellation venture, the evidence would not appear to support a finding that Hobson or Waldrop exercised either actual or constructive possession over the marijuana on board the aircraft. The mere fact that they had made a deposit of $1,500,000 on the incoming shipment does not satisfy the requirement that they exercised dominion and control over it. The absence of actual or constructive possession, however, does not foreclose the possibility that they were properly convicted under an aider and abettor theory of liability. Hobson is mistaken in his belief that he may not be convicted as an aider and abettor when he was indicted as a principal only: "One who has been indicted as a principal may be convicted on evidence showing only that he aided and abetted the commission of the offense." *United States v. Oquendo*, 505 F.2d 1307, 1310 n. 1 (5th Cir.1975).

In *United States v. Trevino*, 556 F.2d 1265 (5th Cir.1977), the court set out the requirements for aiding and abetting possession of a controlled substance with intent to distribute:

> Trevino and Gonzalez were charged in this count under 21 U.S.C. § 841(a)(1) (1976), making illegal any possession of a controlled substance with intent to distribute, and 18 U.S.C. § 2 (1970), providing that "whoever ... aids, abets, counsels, commands, induces or procures" the commission of a federal crime is punishable as a principal for the violation itself. To aid or abet another in the commission of a crime within the meaning of the statute requires that the defendant "in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, that he seek by his action to make it succeed."

*Id.* at 1269 (citations omitted). In this case, Cobb indicated that he, Waldrop and Hobson were primarily responsible for the Constellation venture. Waldrop and Hobson advanced money to Cobb to purchase the marijuana in Colombia. After the initial airplane venture had failed, both Hobson and Waldrop made telephone calls to Cobb pressuring him to attempt a second airplane venture. Cobb agreed, after securing a promise that Hobson and Waldrop would purchase a substantial portion if not all of the load. These facts establish to our satisfaction that Hobson and Waldrop could properly be found to have associated themselves with the venture and to have sought by their actions to make the venture succeed. *Trevino*, 556 F.2d at 1269–70.

The appellants' reliance upon *United States v. Jackson* for a contrary conclusion is misplaced. 526 F.2d 1236 (5th Cir.1976). There, the evidence indicated that Jackson assisted his co-defendant in the distribution of cocaine already in the possession of the co-defendant. Jackson's conviction for aiding and abetting his co-defendant in the possession with intent to distribute cocaine was reversed on appeal, on the ground that while evidence was sufficient to support his conviction for aiding and abetting the distribution of cocaine, there was no evidence that he aided and abetted the possession. The court's conclusion was based upon an absence of evidence that Jackson had helped his co-defendant obtain the cocaine; rather, it was clear that Jackson did not aid or abet his colleague until after the cocaine had come into the co-defendant's possession. In contrast, Hobson and Waldrop's efforts were directed toward assisting Cobb in acquiring the marijuana. The court's opinion in *Jackson* is thus wholly consistent with our conclusion that Hobson and Waldrop were properly convicted of possession under an aiding and abetting theory.

## III. Bascaro

The only issue raised by Bascaro that merits discussion and that was not considered previously as a common issue, is his double jeopardy claim.[16] The govern-

---

16. As previously discussed in connection with Villanueva's continuing criminal enterprise conviction (CCE), conspiracy to import is a lesser included offense of CCE; in light of Bascaro's

ment appears to acknowledge that Bascaro was previously tried and convicted of conspiracy to possess marijuana with intent to distribute in connection with a smuggling venture undertaken by the enterprise/conspiracy being prosecuted in the instant case. If true, this state of affairs would raise a question as to the validity of Bascaro's subsequent continuing criminal enterprise conviction and possibly his RICO conspiracy conviction in this case. *See United States v. Phillips*, 664 F.2d 971, 1015 n. 64 (5th Cir. Unit B 1981); *see generally id.* at 1004–1015. We do not, however, reach the merits of Bascaro's double jeopardy claim. The issue is raised for the first time on appeal; Bascaro's double jeopardy defense was thus waived by his failure to assert it at trial. *Grogan v. United States*, 394 F.2d 287, 289 (5th Cir.1967).

■ Bascaro attempts to justify his failure to raise the double jeopardy defense until now on the basis of the district court's denial of Bascaro's motion for a bill of particulars. This is an exercise in obfuscation. In order to make a timely objection to the instant prosecution on the double jeopardy grounds previously discussed, Bascaro needed only the indictment and record of judgment in the former prosecution, and the indictment in the present case. A bill of particulars would have furnished no additional relevant information.

■ Bascaro's motion for a bill of particulars, and his assignment of error to the court's refusal to grant that motion, relates to a different and less troubling double jeopardy claim. The function of a bill of particulars is to provide a defendant with information about the details of the charge against him if this is necessary to the preparation of his defense, and to avoid prejudicial surprise at the trial. *United States v. Diecidue*, 603 F.2d 535 (5th Cir.1979); *see also* C. Wright, *Federal Practice and Procedure* § 129. A bill of particulars has been held to be appropriate where necessary to permit the defendant to plead double

CCE conviction, we must therefore vacate his other conspiracy conviction on double jeopardy

ble jeopardy in the event of a subsequent prosecution of the same offense. *United States v. Gorel*, 622 F.2d 100, 104 (5th Cir.1979). The thrust of Bascaro's argument is that his activities in connection with the smuggling episode for which he had been previously convicted were not listed among the overt acts of the enterprise in the instant indictment, yet were used to convict him again here. He asserts that a bill of particulars would have revealed as much, but that as a consequence of the denial of his motion for a bill of particulars, Bascaro was unprepared to lodge a double jeopardy objection.

The motion for a bill of particulars was properly denied. Acts committed by Bascaro in connection with the episode for which he was previously tried were not included among the overt acts listed in the present indictment for the very simple reason that those acts were not part of the present indictment. The fact that various witnesses made passing references to the episode in the course of their testimony does not prove the contrary. In short, Bascaro was not convicted in this case on the basis of facts peculiar to the incident for which he had been previously tried, and a bill of particulars amplifying the details of the charges against him in this case would have served no purpose.

*Conclusion*

James raises no issues singular to him that warrant separate discussion. He and other defendants raise a number of questions concerning a variety of alleged prosecutorial misconduct that a review of the record reveals are wholly without merit. The convictions of Hobson, Waldrop, Fernandez, and James are affirmed. Villanueva's convictions for conspiracy to import a controlled substance and conspiracy to possess a controlled substance with intent to distribute are vacated, as is Bascaro's conviction for conspiracy to import. Their remaining convictions are affirmed.

grounds.

AFFIRMED IN PART, VACATED IN PART.

