UNITED STATES of America,
Plaintiff–Appellee,

v.

Noble C. BEASLEY, Andre Bruce White, Stephanie Nodd, Richard Stanberry, Defendants–Appellants.

No. 90–7888.

United States Court of Appeals, Eleventh Circuit.

Oct. 5, 1993.

As Amended Oct. 28, 1993.

---

**54.** We therefore need not consider the Establishment Clause implications of the provision.

Ronnie L. Williams, Mobile, AL, for Beasley.

W. Gregory Hughes, Mobile, AL, for White.

Neil Hanley, Mobile, AL, for Nodd.

Arthur J. Madden, III, Mobile, AL, for Stanberry.

E.T. Rolison, Asst. U.S. Atty., Mobile, AL, for U.S.

Before COX, Circuit Judge, CLARK and WELLFORD *, Senior Circuit Judges.

CLARK, Senior Circuit Judge:

Defendants appeal their convictions for conspiracy to distribute and to possess with intent to distribute crack cocaine.** We affirm the convictions of all of the defendants and affirm the sentence of defendant Noble C. Beasley. For reasons set forth below, we vacate the sentences of the remaining defendants and remand for resentencing.

## I. BACKGROUND FACTS

The government filed a one count indictment against defendants Noble C. Beasley, Stephanie Nodd, Andre Bruce White, Terry Herron (Beasley's son), Toney Nodd (Stephanie's brother), and Richard Stanberry. Also named in the indictment was Carlos Edman Jarmillo, who was a fugitive at the time the defendants were tried. The indictment charged the defendants with conspiring to distribute and to possess with intent to distribute more than five kilograms of cocaine base and crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. All of the defendants, with the exception of Stanberry, were tried together; Stanberry was tried later in a separate trial. The government's principal witness at both trials was John Christopher, a convicted drug dealer who cooperated with the government in hopes of having his prison sentence reduced.

At the trial of Beasley, Stephanie and Toney Nodd, White, and Herron, Christopher testified as follows. In 1987, while Christopher was living in Atlanta, Georgia, Beasley purchased cocaine from Christopher on several occasions; each purchase was in the amount of one-half of a kilogram. In January 1988, Christopher moved to South Carolina because he had been arrested in Atlanta. Beasley continued to purchase cocaine from Christopher after this move to South Carolina. During one of these transactions, Beasley told Christopher that he hated to see Christopher moving around to avoid the police and that if Christopher needed a place to work where there would be no trouble, he could come to Mobile, Alabama, where Beasley lived. Beasley said that he knew a lot of the police officers in Mobile and that he would know ahead of time if there was going to be any trouble.

Christopher was later arrested in South Carolina, and he contacted Beasley about moving to Mobile. Christopher met Beasley at a hotel in Atlanta, and Beasley drove Christopher, one of the women who worked for Christopher, and Christopher's cocaine equipment to Mobile. On the drive to Mobile, Beasley and Christopher agreed that they would be partners in the cocaine business in Mobile, evenly splitting the profits. Beasley agreed to show Christopher where he could work and where Christopher's workers could sell cocaine. Beasley also agreed to let Christopher know ahead of time if there would be trouble from the police, so that Christopher could leave before he was arrested. Christopher was to actually operate the cocaine business.

When Beasley and Christopher arrived in Mobile, Beasley rented Christopher a hotel room. The next day, Beasley showed Christopher places in Mobile where Christopher might want to have his workers sell cocaine. Among other places, Beasley took Christopher to Esau Street, where a number of people were selling crack cocaine on the street. Beasley pointed out defendant Bruce White's house, which is located on Esau Street. Later, in a meeting arranged by Beasley, Christopher and White reached an agreement regarding the use of White's house and yard; in exchange for crack cocaine, White agreed to allow Christopher's workers to sell crack cocaine in his yard and to run into his house if and when the police came.

---

* Honorable Harry W. Wellford, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

** Defendant Andre Bruce White died while this appeal was pending. Accordingly, we dismiss White's appeal as moot and remand to the dis-

Christopher told Beasley that he wanted to meet someone who could sell cocaine for him, and Beasley introduced him to defendant Stephanie Nodd. Stephanie Nodd showed Christopher how to cut crack cocaine into a "tink," which is the unit of measurement in which crack cocaine was sold in Mobile, and she began selling the crack cocaine that Christopher provided to her. Christopher sent for two of his sons and one of his girlfriends, and they came to Mobile to sell cocaine for him, as did Christopher's brother's girlfriend. Christopher also planned to use local workers, because the local workers could identify the police and point out the persons with whom Christopher's workers should and should not deal. Beasley rented a car for Christopher to use, and Christopher and Beasley talked every day.

On or about July 4, 1988, Christopher told Beasley that he was "going to really open up and start dealing heavy." [1] Christopher sent his workers to Florida to purchase cocaine, and he also purchased cocaine from a Colombian named Carlos, who brought the cocaine to Mobile. Christopher cooked the cocaine into crack cocaine and provided it to his workers to be sold on Esau Street. Stephanie Nodd, Toney Nodd, Christopher's two sons, one of Christopher's girlfriends, and Christopher's brother's girlfriend all sold crack cocaine, which was provided to them by Christopher, from White's yard on Esau Street. Eventually, Stephanie Nodd stopped selling crack cocaine on the street and began delivering cocaine to and collecting money from the other workers in White's yard. According to Christopher, Stephanie Nodd "really ran everything because she knew everybody [in Mobile]." [2] Both Stephanie Nodd and Christopher wore beepers, and Christopher also communicated with his workers by making telephone calls to White's house. After Christopher's sons were arrested for selling crack cocaine at a hotel, Christopher decided that he needed a house where he could cook the crack cocaine. Christopher gave Beasley $10,000, and Beasley obtained for Christopher's use a house located behind the store that Beasley owned. Christopher's operation ceased when he was arrested in Mobile on August 10, 1988.

At Stanberry's trial, Christopher testified as follows. Stanberry purchased cocaine from Christopher on several occasions while Christopher was living in Mobile. These purchases totaled approximately one-half a kilogram of cocaine. Christopher would sometimes "front" the cocaine to Stanberry. [3] Stanberry sold the crack cocaine that he purchased from Christopher on the street in front of Stanberry's cousin's house, which was right around the corner from White's house on Esau Street. When Christopher went to Esau Street, he would see Stanberry selling crack cocaine to passing cars. Everyone selling crack cocaine in the Esau Street vicinity had a territory; Stanberry sold from his cousin's territory around the corner from Esau Street, and Christopher's workers sold from their territory in front of White's house.

At some point before Christopher's arrest in August 1988, Stanberry told Christopher that Carlos had a big package of cocaine that he was prepared to bring to Mobile; however, Carlos wanted to transport the package in Stanberry's car, which was in the shop in Tampa, Florida. Christopher gave Stanberry $1,500 to get the car out of the shop, with the understanding that Stanberry would repay the loan after he sold some of the cocaine that Carlos would be transporting. Sometime thereafter, Carlos arrived in Mobile in Stanberry's car with three kilograms of cocaine. Christopher purchased two of the three kilograms, and Stanberry got the remaining kilogram. After this transaction, Christopher and Stanberry "split up." [4] Carlos was on his way to Mobile with a second load of ten kilograms of cocaine when Christopher was arrested. Christopher was to purchase a portion of this ten kilograms; he did not know who was to get the remainder.

Terry Herron and Toney were acquitted; the remaining defendants were convicted. Beasley and Stanberry were sentenced to life without parole. Stephanie Nodd was sentenced to 360 months in prison, and White was sentenced to 324 months in prison.

---

trict court with directions to vacate the judgment of conviction against White and dismiss the indictment against White. *United States v. Schumann,* 861 F.2d 1234, 1236 (11th Cir.1988).

1. R5–366.

2. R5–391.

3. 1st Supp. R2–27.

4. 1st Supp. R2–38.

## II. DISCUSSION

### A. The Convictions

■ Beasley raises six issues on appeal, all attacking his conviction. First, he contends that the district court erred in admitting the testimony of Jimmy Young as extrinsic act evidence under Fed.R.Evid. 404(b). Young testified that Beasley purchased cocaine from him on several occasions in 1987 and 1988; that, in one of these transactions, Beasley provided Young with the deed to a house in Mobile in exchange for 28 ounces of cocaine; and that Beasley knew that Young "had a strong [drug] connection coming out of Colombia"[5] and, therefore, tried to convince Young to accompany him to a ski resort in Tennessee to deal drugs. Young's testimony was offered by the government to prove Beasley's intent, which Beasley placed in issue by pleading not guilty to the crime charged.[6] Evidence of an extrinsic offense is admissible to prove intent if its probative value is not outweighed by undue prejudice.[7] Such evidence is probative if the intent involved in the extrinsic offense is the same as that of the charged offense.[8] Here, both Young and Christopher were drug dealers with access to large volumes of drugs through contacts outside of Alabama. Beasley undertook, through real estate transactions and otherwise, to establish and attempt to solidify his relationships with these two men. Thus, Young's testimony, like Christopher's testimony, evidences Beasley's intent to deal in cocaine by developing relationships with established dealers. We hold that the probative value of Young's testimony was not outweighed by undue prejudice. The district court did not err in admitting this testimony.

■ Second, Beasley contends that the government violated the Jencks Act by failing to produce a Drug Enforcement Administration ("DEA") report containing information provided by Jimmy Young. The government had agreed to produce all Jencks material at the close of the testimony of each witness, and the government did so with the exception of this report regarding Jimmy Young. The district court held that the report did constitute Jencks material, but that the government's failure to produce the report was harmless. We agree. The harmless error doctrine is applicable to Jencks Act violations, but it must be strictly applied.[9] We have carefully reviewed Young's testimony at trial and the DEA report, and we find that the testimony did not differ in *any* respect from Young's statement as recorded in the report. Thus, the government's error in failing to produce the report was harmless.[10]

■ Third, Beasley argues that the district court erred in denying his trial counsel's request for a continuance. Counsel had requested the continuance so that he would not be forced to try Beasley's case back-to-back with a state court capital murder case; counsel alleged that he could not adequately prepare for both cases. A motion for a continuance falls within the sound discretion of the district court and will not be disturbed absent abuse of discretion.[11] Here, the district court had already granted *three* continuances at Beasley's request when it denied his *fourth* such request. Although Beasley's first counsel did withdraw based on a potential conflict of interest, Beasley's substitute counsel, who still represents him, filed a notice of appearance two months before Beasley's trial began. We have carefully reviewed the record, and we see no indication that Beasley's counsel was not adequately prepared to defend the case. Moreover,

5. R9–1390–1391.

6. *United States v. Jones*, 913 F.2d 1552, 1566 (11th Cir.1990).

7. *Id.*

8. *United States v. Hernandez*, 896 F.2d 513, 522 (11th Cir.), *cert. denied*, 498 U.S. 858, 111 S.Ct. 159, 112 L.Ed.2d 125 (1990).

9. *United States v. Beasley*, 576 F.2d 626, 629 (5th Cir.1978), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979).

10. *See United States v. Anderson*, 574 F.2d 1347, 1357 (5th Cir.1978) ("The statement itself would have had no value to the defense even for impeachment, since it corroborated [the witness's] direct testimony. Thus, any error in the failure to disclose the statement under the Jencks Act would be, at most, harmless.").

11. *United States v. Jimenez–Diaz*, 659 F.2d 562, 567 (5th Cir. Unit B Oct. 1981), *cert. denied*, 456 U.S. 907, 102 S.Ct. 1754, 72 L.Ed.2d 164 (1982).

Beasley has not indicated that he was in any way prejudiced by the denial of the motion for continuance. The district court did not abuse its discretion.[12]

■ Fourth, Beasley argues that the district court erred in declining to sever his trial from that of his son, Terry Herron. To compel severance, the defenses of co-defendants must be more than merely antagonistic; the defenses must be antagonistic "to the point of being mutually exclusive." [13] Beasley did not offer any evidence that would constitute a defense to the charges against him. Herron offered his own testimony, seeking to establish that he was not a member of the drug conspiracy. Beasley relies on two portions of Herron's testimony to support his severance argument. First, Herron admitted that he had obtained two beepers at his father's request and that he had left the beepers at his father's store. Second, he admitted that he had wired money to Florida. Another witness established that this money was used to purchase cocaine. When asked who instructed him to send the money, Herron testified: "I don't know. It could have been my father. It could have been my sister." [14] This testimony is the *only* evidence that Herron offered that even remotely implicated Beasley. While the testimony arguably supports the government's case against Beasley, it does not render Herron's defense and Beasley's defense "mutually exclusive." As we said in *United States v. Castillo–Valencia*:

> At the outset we recognize that any time a defendant pleads not guilty and proceeds to trial, the defense of a co-defendant which implicates that defendant will be antagonistic to the plea of not guilty. This is not enough, however, to mandate severance. The requirement is a more stringent one, namely, that a co-defendant suf-

fer actual prejudice from the denial of his motion to sever.

. . . . .

> Where appellants presented no evidence amounting to a defense to the charges against them, prejudice cannot be found simply by virtue of the fact that the defenses of their co-defendants further implicated the appellants' guilt.[15]

The district court did not abuse its discretion in denying Beasley motion for severance.

■ Fifth, Beasley argues that the district court erred in denying him unrestricted access to the transcripts of certain tape recordings. Several months before Beasley was tried, the government received information that Beasley's first counsel (who subsequently withdrew from the case) had attempted to bribe Christopher, the government's main witness against Beasley. The government initiated an investigation into this possible obstruction of justice, and Christopher agreed to cooperate in the investigation. Thereafter, at the government's request, Christopher tape-recorded several conversations between himself and Beasley's first counsel. At the beginning of defendants' trial, defense counsel requested access to the transcripts of these tape-recorded conversations, contending that the transcripts could contain information useful to impeach Christopher. The government objected, arguing that the release of the transcripts could prejudice the ongoing investigation. The district court reviewed the transcripts *in camera* and released to defense counsel those portions of the transcripts that the court determined contained *Brady*[16] material. Explaining its decision to release those portions of the transcripts, the district court said: "Even though it appears that Christopher was programmed by the government to

---

**12.** *See id.* ("We are unable to discern any prejudice. [The defendant] claims none in his briefs and pointed to none during the oral argument of this appeal. [Footnote omitted.] There is no basis to conclude that the district court abused its discretion in denying [the defendant's] motion for a continuance.").

**13.** *United States v. Castillo–Valencia*, 917 F.2d 494, 498 (11th Cir.1990), *cert. denied*, 499 U.S. 925, 111 S.Ct. 1321, 113 L.Ed.2d 253 (1991).

**14.** R9–1509.

**15.** 917 F.2d at 499 (citation and footnote omitted).

**16.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

lead [Beasley's first counsel] on, the fact that Christopher indicated he could be bought is something that's Brady material." [17] After defense counsel had reviewed the redacted transcripts, Beasley's counsel indicated that he intended to call Beasley's first counsel as a witness. The government took the position that it should be permitted to use the complete transcripts, rather than the redacted versions that were provided to defense counsel, in cross-examining Beasley's first counsel; Beasley's counsel vehemently disagreed. Later, however, *before* the district court made a ruling on this dispute, Beasley's counsel said: "In talking to Mr. Beasley, Your Honor, we're not going to call [Beasley's first counsel]. So the whole issue is just a dead issue." [18] Thus, Beasley cannot now complain, as he does in his appellate briefs, of the "risk" that the government would be permitted to cross-examine Beasley's first counsel with information about which defense counsel were unaware. Moreover, our review of the record indicates that Beasley was not in any way prejudiced by the district court's handling of this sensitive matter. Accordingly, this argument is without merit.

■ Finally, Beasley argues that the district court erred in denying his motion for a mistrial. During his cross-examination of Christopher, Beasley's counsel asked Christopher how long he had known Beasley. In response, Christopher said: "I met him in prison in . . . the '70s." [19] Beasley's counsel objected to this reference to Beasley having been in prison and moved for a mistrial. The district court denied the motion for a mistrial, but gave the following curative instruction:

Ladies and gentlemen of the jury, the last remark of this witness about meeting someone in prison, you must disregard that. Pay no attention to it. It has noth-

ing to do with this case. Put it out of your mind.[20]

The district court also instructed Christopher not to volunteer information about someone being in prison. This court has said:

"While use of such words as 'jail,' 'prison,' 'arrest' are, generally to be avoided, where irrelevant, the mere utterance of the word does not, without regard to context or circumstances, constitute reversible error per se." [21]

Here, Christopher mentioned "prison" in response to a question by Beasley's counsel, not a question by the prosecutor. While the prosecutor's innocence would not insulate against reversal if Christopher's testimony had clearly prejudiced Beasley,[22] we find that Beasley was not prejudiced. The reference to "prison" was made in passing, added nothing to the government's case, and was followed quickly by the district court's curative instruction. Accordingly, we find that the district court's denial of the motion for mistrial did not constitute reversible error.

■ Defendant Stephanie Nodd attacks her conviction on one ground only. She contends that the prosecutor's repeated references during closing argument to the "war on drugs" was improper and so prejudicial as to require reversal of her conviction. During his closing argument, the prosecutor made references to war and employed war-related terminology to draw an analogy between the participants in a war and the participants in defendants' drug organization and in the law enforcement agencies that investigated the organization. The prosecutor twice during his argument indicated that the jury was a participant in the war on drugs:

[THE PROSECUTOR:] I want to say a few words about—and I know you've heard it and I've heard it—war on drugs, war on

---

17. R5–475.

18. R11–1433–1434. Neither Beasley nor the government mentions this waiver by Beasley's counsel in their appellate briefs. This omission on the part of either of these parties is negligent at best.

19. R6–500.

20. R6–505.

21. *United States v. Veteto*, 701 F.2d 136, 139–40 (11th Cir.) (quoting *United States v. Barcenas*, 498 F.2d 1110, 1113 (5th Cir.), *cert. denied*, 419 U.S. 1036, 95 S.Ct. 521, 42 L.Ed.2d 312 (1974)), *cert. denied*, 463 U.S. 1212, 103 S.Ct. 3548, 77 L.Ed.2d 1396 (1983).

22. *See id.* at 140.

drugs. You've heard it. You hear it all the time. And this is a war. This is just—this is just another battle in that war. It's a battle to save folks from being enslave [sic] by crack cocaine. That's what, that's what this battle's about. Now, I've got a place in that war. You've got a place in that war. The judge has got a place. Those defendants over there all have a place in it.

DEFENSE COUNSEL: Judge, I object to [the prosecutor] saying that these people have a place in a war against—

THE COURT: I sustain that.

DEFENSE COUNSEL: That's not right. These people—

THE COURT: No. You are neutral, you are impartial, and so is the judge. So am I. I'm neutral.

. . . . .

[THE PROSECUTOR:] And for profiteers like General Noble C. Beasley to do that to—not just his—not just Esau Street. It's not just Esau Street. It's all over the country. And people, there's another John Christopher out there somewhere—

DEFENSE COUNSEL: Judge, I object to this line of questioning. They are not engaged in the war against crime. They are to decide this case, not anywhere else in the country, and I object to it—

THE COURT: Again ... ladies and gentlemen of the jury, you are supposed to be fair and impartial. You are neutral. You are not engaged in any war. And neither is the Court.[23]

The prosecutor's comments quoted above are clearly improper. These comments were an appeal by the prosecutor for the jury to act as "the conscience of the community," and we find that the comments were "calculated to inflame."[24] The impact of these comments on the jury, however, was neutralized to some extent by the district court's curative instructions.[25] Viewing the comments in the context of the entire record, we are convinced that the comments were not "prejudicial to a substantial right" of defendants.[26] Accordingly, the comments do not constitute reversible error.

■ Stanberry attacks his conviction on three grounds. First, he argues that the evidence is insufficient to sustain his conviction because it establishes nothing more than a buyer-seller relationship between him and Christopher. "Where the buyer's purpose is merely to buy, and the seller's purpose is merely to sell, and no prior or contemporaneous understanding exists between the two beyond the sales agreement, no conspiracy has been shown."[27] The evidence presented against Stanberry establishes far more than merely a buyer-seller relationship. Christopher testified that Stanberry purchased crack cocaine from him on several occasions during Christopher's short stay in Mobile and that he sometimes fronted the cocaine to Stanberry. Christopher knew that Stanberry was selling the cocaine near Esau Street, around the corner from White's house. Christopher also testified that he and Stanberry worked together to arrange for Carlos to bring three kilograms of cocaine to Mobile; Christopher testified that he and Stanberry divided these three kilograms between them and then "split up." From this evidence, the jury could have reasonably inferred a continuing course of conduct between Christopher and Stanberry designed to result in the distribution of cocaine on

---

**23.** R10–1606–1607, R10–1630–1631.

**24.** *See United States v. Bascaro,* 742 F.2d 1335, 1354 (11th Cir.1984) ("prosecutorial appeals for the jury to act as 'the conscience of the community' are not impermissible, unless calculated to inflame"), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985); *see also United States v. Solivan,* 937 F.2d 1146, 1153 (6th Cir. 1991) ("defendant's constitutional right to a fair trial was violated because the appeal to the community conscience in the context of the War on Drugs prejudicially impacted on her").

**25.** *See United States v. Smith,* 918 F.2d 1551, 1562 (11th Cir.1990) ("Because statements and arguments of counsel are not evidence, improper statements can be rectified by the district court's instruction to the jury that only the evidence in the case be considered.").

**26.** *Bascaro,* 742 F.2d at 1353.

**27.** *United States v. Burroughs,* 830 F.2d 1574, 1581 (11th Cir.1987), *cert. denied,* 485 U.S. 969, 108 S.Ct. 1243, 99 L.Ed.2d 442 (1988).

Esau Street.[28] The evidence is sufficient to sustain Stanberry's conviction.

 Second, Stanberry argues in the alternative that the district court erred in failing to instruct the jury on the buyer-seller theory of defense. Stanberry concedes that, because he did not request such an instruction or object to its omission, we review the district court's failure to give the instruction for plain error only. As noted above, the evidence presented against Stanberry establishes far more than merely a buyer-seller relationship between Stanberry and Christopher. The district court did not, therefore, commit plain error by failing to instruct the jury on the theory of defense.

 Finally, Stanberry argues that the district court erred in denying his motion for a continuance, which was made in the midst of trial. During the government's case in chief, one of the DEA agents testified that he had observed Stanberry in the vicinity of Esau Street in a black BMW with chrome wheels. During his cross-examination, the agent corrected his testimony, stating that the BMW had gold wheel rims. Stanberry's counsel moved for a continuance to permit him to obtain a witness to establish the color of the wheel rims on Stanberry's BMW. The district court denied the motion. We fail to see how Stanberry could have been prejudiced by his inability to establish this very minor point. Stanberry did not present any evidence to suggest that the agent had erroneously identified either Stanberry or his car, and he does not articulate any other reason why the color of the wheel rims is significant. The district court did not abuse its discretion in denying the motion for continuance.

B. *The Sentences*

1. *Quantity of Cocaine*

 Stanberry and Nodd challenge the sufficiency of the evidence to support the district court's findings as to their involve-ment with specific quantities of cocaine. For sentencing purposes, a member of a drug conspiracy is liable for his or her own acts and for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."[29] The task of the district court is as follows:

[T]o determine a defendant's liability for the acts of others, the district court must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant. Once the extent of a defendant's participation in the conspiracy is established, the court can determine the drug quantities reasonably foreseeable in connection with that level of participation. If the court does not make individualized findings, the sentence may nevertheless be upheld if the record supports that amount of drugs attributed to the defendant. The government must establish the quantity of drugs by the preponderance of the evidence.[30]

We review the district court's determination as to the quantity of drugs attributable to a defendant under the clearly erroneous standard.[31]

 Stanberry's PSI states that he should be held accountable for the total amount of crack cocaine that Christopher possessed or distributed in Mobile; thus, the PSI sets Stanberry's base offense level at 40, the level applicable to offenses involving more than 5 kilograms but less than 15 kilograms of crack cocaine. The district court adopted the PSI without making any specific findings as to the quantity of cocaine attributable to Stanberry. We have carefully reviewed the record, and we find the evidence insufficient to establish by a preponderance of the evidence that Stanberry is liable for more than 5 kilograms of crack cocaine. There is absolutely no evidence that Stanberry participated in the conspiracy among Christopher, Beasley, Nodd, and White. Indeed, Christopher testified that Stanberry

28. *See id.* at 1581.

29. U.S.S.G. § 1B1.3(a)(1)(B).

30. *United States v. Ismond,* 993 F.2d 1498 (11th Cir.1993) (citations omitted).

31. *United States v. Robinson,* 935 F.2d 201, 205 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 789 (1992).

**1562**

sold drugs in a different "territory" near Esau Street than did those associated with the conspiracy among Christopher, Beasley, Nodd, and White. Thus, the district court erred in holding Stanberry accountable for all of the drugs attributable to that conspiracy. On the record before us, we see only two quantities of drugs that may be attributable to Stanberry. First, Christopher testified that he sold Stanberry one-half of a kilogram of cocaine over the course of their dealings; this one-half of a kilogram is clearly attributable to Stanberry. Second, Stanberry may be held accountable for some or all of the 3 kilograms of powder cocaine that Carlos brought to Mobile.[32] The district court's finding that Stanberry is liable for more than 5 kilograms of crack cocaine is clearly erroneous.

■ Nodd's PSI states that she should be held accountable for 6.5 kilograms of crack cocaine, which is the quantity that the probation officer estimated was sold by Christopher's workers in White's yard on Esau Street. Without making any specific factual findings, the district court concluded that the evidence was sufficient to establish by a preponderance of the evidence that at least 5 kilograms of crack cocaine was sold on White's premises; thus, the district court set Nodd's base offense level at 40. Without more specific findings by the district court, we cannot affirm this determination. A DEA agent testified at the sentencing hearings that Christopher distributed 17.88 kilograms of cocaine, but the agent admitted that he did not know how much of this amount was distributed on Esau Street. The only evidence offered at trial regarding the quantities sold on White's premises was the testimony of Mary Martin, one of Christopher's workers. Martin testified that she sold crack

cocaine in White's yard, but her testimony as to how much she sold varied widely, from $3,000 worth of crack cocaine a day to $30,000 a day.[33] Moreover, there is nothing in the record to aid us in converting these dollar figures to quantity figures. On remand, the district court should make individualized findings as to the scope of each defendant's participation in the conspiracy and as to the quantities of drugs reasonably foreseeable given each defendant's level of participation.

### 2. Role In the Offense

■ Nodd and Stanberry both argue that the district court erred in increasing their base offense levels by 3 levels based on their aggravating role in the offense. The district court increased the levels pursuant to U.S.S.G. § 3B1.1(b), which provides:

> If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

We review the district court's factual determination of each defendant's role in the offense under the clearly erroneous standard.[34]

■ As to Nodd, the evidence presented at trial is sufficient to sustain the district court's finding. Christopher testified that Nodd "really ran everything"; that she, like Christopher, wore a beeper; and that she delivered crack cocaine to and collected money from the street workers in White's yard. The district court's finding that Nodd was "a manager or supervisor" is not clearly erroneous.

■ As to Stanberry, however, we find that the evidence is not sufficient to sustain the district court's determination. The evidence offered at Stanberry's trial does not support a finding that he was "a manager or

32. Stanberry should not be held accountable for Carlos' second shipment of 10 kilograms of cocaine. Christopher testified that he was to get a portion of this 10 kilograms, but that he did not know who was to get the remainder.

33. Christopher testified that Martin made anywhere from $1,000 to $4,000 or $5,000 a day and that "[h]er best day I think she made $10,000 one day." R5–394.

34. *United States v. Jones*, 933 F.2d 1541, 1546 (11th Cir.1991).

supervisor." Indeed, Christopher testified that Stanberry sold crack cocaine on the street around the corner from White's house; this evidence indicates that Stanberry, at least at times, acted as a mere street seller. At sentencing, the government offered the testimony of a DEA agent, who testified that a confidential informant had told him that Stanberry was supplying drugs to three individuals, all of whom had subsequently been arrested for possession of cocaine. The government did not offer any evidence, however, as to whether these three individuals were distributors of cocaine or mere users, as to the nature of Stanberry's relationship with these three individuals, or as to the degree of control, if any, that he exercised over them. Based on the record before us, the district court's finding that Stanberry was "a manager or supervisor" is clearly erroneous.

### 3. *Allegedly Unconstitutional Guidelines*

Stanberry argues that the wide disparity in punishments for crimes involving crack cocaine and those involving powder cocaine results in unconstitutional discrimination against blacks. This court has recently rejected this argument.[35] Accordingly, it is without merit.

### III. *CONCLUSION*

For the foregoing reasons, the convictions of Beasley, Nodd, and Stanberry are AFFIRMED, and the sentence of Beasley is AFFIRMED. The sentences of Nodd and Stanberry are VACATED and their cases REMANDED for resentencing.

---

**35.** *See United States v. King,* 972 F.2d 1259 (11th Cir.1992).