[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-13365
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 29, 2010
JOHN LEY
CLERK

D. C. Docket No. 08-00228-CR-ORL-22KRS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAMON GOITIA MORA,
a.k.a. Moncho,
JONATHAN MELENDEZ,
a.k.a. Chulo,
a.k.a. Rasta,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(April 29, 2010)

Before BLACK, MARTIN and FAY, Circuit Judges.

PER CURIAM:

Ramon Goitia-Mora and Jonathan Melendez appeal from their convictions for conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. On appeal, Goitia-Mora and Melendez argue that their convictions should be reversed because they were not involved in a single conspiracy with Miguel Montes, as alleged in the indictment. They argue that, instead, they were involved in a separate conspiracy that was not charged in the indictment. Goitia-Mora and Melendez contend that there was thus a material variance between the charge set forth in the indictment and the evidence presented at trial. Melendez argues that this material variance caused him substantial prejudice because he was unable to challenge the evidence concerning Montes's drug-trafficking activities. He concedes, however, that the government provided him with all of its discovery regarding Montes's drug-trafficking activities. Goitia-Mora does not point to any prejudice that he suffered as a result of the alleged material variance.

In addition, Melendez argues that his conviction should be reversed because the evidence showed that he had only a buyer-seller relationship with Montes, as opposed to a conspiratorial relationship. He also asserts that the district court erred by failing to instruct the jury that, where the extent of the relationship between two

2

individuals is an agreement to buy and sell drugs, the evidence of this relationship, standing alone, is insufficient to demonstrate the individuals were involved in a conspiracy together.

For the reasons set forth below, we affirm.

## I.

A federal grand jury charged the following defendants with conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846: (1) Melendez; (2) Goitia-Mora; (3) Omar Medina-Santiago; (4) Jose Rosario-Oquendo; (5) Alberto Torres-Garrastequi; (6) Yahaira Cordero-Gonzalez; (7) Alba Rivera; (8) Jessica Cruz; (9) Luis Cruz; (10) Jose Rodriguez; (11) Edgardo Rivera-Ocana; and (12) Jorge Rivera.

At trial, Karl Weiss, a special agent employed by the Drug Enforcement Administration, testified that he began an investigation into the present case in August 2006, after U.S. postal inspectors learned that boxes containing cocaine were being shipped from Puerto Rico into Orlando, Florida. In order to identify the individuals responsible for these shipments, Weiss and other government agents made controlled deliveries of the boxes to their intended recipients. The agents then conducted surveillance to determine who ultimately took possession of the boxes. During the investigation, the agents identified Miguel Montes as an

3

individual who was involved in the drug-trafficking activity. By monitoring Montes's telephone communications, the agents learned that Montes communicated with Melendez and Goitia-Mora during 2007.

Cordero-Gonzalez testified that Melendez was in the business of importing cocaine from Puerto Rico, and that she had agreed to assist Melendez by receiving boxes of cocaine from Puerto Rico via mail. Cordero-Gonzalez and her roommate, Alba Rivera, agreed to further assist Melendez by procuring additional delivery addresses for the shipments of cocaine. Rivera recruited Maria Adames and other individuals to receive boxes of cocaine on Melendez's behalf. After the boxes were delivered to various addresses, Cordero-Gonzalez ensured that they ultimately were delivered to Melendez. On cross-examination, Cordero-Gonzalez testified that she did not know Montes, and had never met him. She explained that Melendez did not communicate with many of the people that she had recruited to receive boxes, and that he instead preferred to communicate only with her, and let her manage the individuals who had been recruited to receive boxes.

Next, various government agents and U.S. postal inspectors testified that, while conducting surveillance in this case, they observed that boxes of cocaine were delivered to Melendez's associates at various locations, including the following addresses in the Orlando area—7513 Rio Pinar, 5823-B Diego Street,

4

and 5740-B Shenandoah Way. Two of these witnesses testified that the boxes of cocaine mailed to Melendez's associates were packaged in the following manner: one large "outer" box containing a smaller plastic box, with the smaller box containing several kilograms of cocaine, as well as carbon paper, newspaper, and dryer sheets.

Montes testified that he began importing cocaine from Puerto Rico into Orlando, Florida, in 2005. He explained that, in order to ship cocaine, his associates would place the cocaine in a small box. They would wrap the cocaine in carbon paper and dryer sheets. They would then place the small box containing cocaine into a larger box. Giorliana Cortijo assisted Montes by recruiting individuals to receive the boxes of cocaine that were shipped from Puerto Rico. Montes communicated with Cortijo rather than directly communicating with the individuals.

Montes further testified that he knew Melendez and Goitia-Mora, but did not know Alba Rivera or Cordero-Gonzalez. Montes would speak with Melendez about the cocaine business, stating the following about the nature of their conversations: "[T]wo people that are in the same business, you know, talk about the business, you know, how things [are] going, this and that." On anywhere between 10 to 15 occasions, he supplied Melendez with cocaine on a credit basis,

whereby he would give cocaine to Melendez, and Melendez would pay him for the cocaine after he resold it. On at least one occasion, Melendez likewise supplied approximately two kilograms of cocaine to Montes on a credit basis. Goitia-Mora often would serve as a courier of cocaine and money between Melendez and Montes. Montes identified a notebook as a notebook that he had used to keep track of various aspects of his drug-trafficking business. In this notebook, he and Cortijo had recorded addresses that he used to receive shipments of boxes of cocaine. These addresses included the following Orlando locations, among others: (1) 5740-B Shenandoah Way, (2) 5823-B Diego Street, and (3) 7513 Rio Pinar.

The government played recordings of telephone conversations between Montes and Melendez. In one of these conversations, Melendez and Montes discussed the price of cocaine, and they also discussed the fact that there had been complaints about the quality of a particular type of cocaine. In addition, Montes informed Melendez that a box of cocaine that he had been expecting from Puerto Rico was missing. Montes explained that the box was supposed to be delivered to Adames. By checking with the shipping company, Montes knew that the package had arrived in the United States and had been received by an individual. Adames, however, denied receiving the box. When Montes informed Melendez of this situation, Melendez offered to assist him in finding the missing box. Montes had

6

believed that the box was stolen, and ultimately called Adames and threatened to kill her. The government next played a recording of a telephone conversation between Montes and one of his associates in Puerto Rico, wherein the two discussed the missing box of cocaine.

The government also played recordings of numerous June 2, 2007, telephone conversations between Melendez, Montes, and Goitia-Mora. In these conversations, they discussed a cocaine transaction, in which Montes would deliver cocaine to Goitia-Mora, and Goitia-Mora would deliver the cocaine to Melendez. In one of these conversations, which was between Melendez and Montes, Melendez asked Montes to give him a discount of $200 on some cocaine so that he could pay Goitia-Mora and still make a $500 profit. Regarding the transaction on June 2, Montes explained that, when he delivered the cocaine to Goitia-Mora, he understood that Melendez would sell the cocaine to customers and then pay him for the cocaine. Additional telephone conversations between Melendez and Montes reflected that they would discuss the price and quality of the cocaine that was generally available in the narcotics trade, and would tease each other in a friendly manner.

On cross-examination, Montes testified that, in his view, he and Melendez ran separate drug-trafficking organizations. Montes knew that Melendez received

7

packages of cocaine from Puerto Rico, but did not know who acted as Melendez's source of cocaine in Puerto Rico. He and Melendez had separate cocaine suppliers. He and Melendez did not share profits with each other. Goitia-Mora did not run errands for Montes, and Montes did not pay Goitia-Mora. Montes communicated with Goitia-Mora only when Goitia-Mora acted as a courier between himself and Melendez. Apart from Goitia-Mora, Montes did not know who was in Melendez's drug-trafficking organization.

On redirect examination, Montes testified that, between January and June of 2007, he sold approximately 50 kilograms of cocaine to Melendez, at prices ranging between $18,000 to $21,000 per kilogram. Thus, he received approximately $1,000,000 from Melendez during this 6-month period.

Ray Schulte, an agent employed by the Orange County Sheriff's Office, testified that, on May 31, 2007, he observed that a package of cocaine was delivered to Adames. The officers monitored telephone calls between Montes and Adames on that day and, as result, the officers were concerned about Adames's safety. On cross-examination, Schulte testified that, based on the telephone conversations that he monitored on May 31, he believed that the box of cocaine that was missing belonged only to Montes and did not belong to Melendez. He further testified that his concern for Adames's safety on May 31 had nothing to do

8

with Melendez.

After the government rested its case, Melendez moved for a judgment of acquittal under Fed.R.Crim.P. 29, arguing that the government failed to prove that a single conspiracy existed, as charged in the indictment. He argued that the evidence showed that he and Montes ran separate drug organizations. Melendez asserted that, to the extent that Adames or any other individual served both organizations as a cocaine recipient, this overlap was incidental, and did not occur due to any agreement between himself and Montes. Melendez further pointed out that he and Montes had separate cocaine suppliers and did not share profits. He argued that the extent of the relationship between his and Montes's organizations was a buyer-seller relationship, where each organization occasionally purchased cocaine from the other organization.

Goitia-Mora joined in Melendez's motion, arguing that the variance between the single conspiracy charged in the indictment and the evidence presented at trial was so material that it had substantially prejudiced him. Goitia-Mora argued that the jury would not be able to differentiate between the two conspiracies that actually existed, and would likely transfer the guilt attributable to parties in Montes's group to parties in Melendez's group. Melendez argued that the material variance between the indictment and the evidence presented at trial prejudiced him

because the government introduced evidence of Montes's threats of violence against Adames over the missing cocaine shipment. He asserted that this evidence pertained only to Montes and the separate conspiracy with which Montes was involved, and that he thus had not been able to challenge this evidence adequately.

The court denied Melendez's and Goitia-Mora's Rule 29 motions, finding that there was sufficient evidence to permit the jury to decide whether they were involved in a single conspiracy with Montes, as alleged in the indictment. The parties had a charge conference, but it is not clear from the transcript whether they discussed a buyer-seller jury instruction. While Melendez referred to his proposed jury instructions during the charge conference, which he apparently had filed with the court at an earlier date, the record does not contain Melendez's proposed jury instructions.

In his closing argument, Melendez argued to the jury that the evidence demonstrated that there had been two separate conspiracies—one among the members of Montes's group and another among the members of his group—instead of a single conspiracy, as charged in the indictment. Melendez further argued to the jury that, in the event that they did not find that a single conspiracy existed, they were required to acquit him. In his closing statement, Goitia-Mora asserted substantially the same argument. In its jury instructions, the

10

court explained to the jury that the defense's theory was that the government had failed to prove that they were involved in a single conspiracy with Montes, as charged in the indictment. The court also instructed the jury that, if they found that the single conspiracy alleged in the indictment did not exist, they were required to acquit Melendez and Goitia-Mora. The court did not give a buyer-seller jury instruction. The jury found Melendez and Goitia-Mora guilty of the conspiracy charge set forth in the indictment.

## II.

We will not reverse a conviction on the ground that a single conspiracy was alleged in the indictment, while multiple conspiracies were proven at trial, unless the variance between the charged conspiracy and the evidence presented at trial is material, and the material variance prejudiced the defendant. *United States v. Richardson*, 532 F.3d 1279, 1284 (11th Cir. 2008), *cert. denied*, 129 S.Ct. 950 (2009). We need not decide whether a jury reasonably could have found that a single conspiracy existed where it is apparent that the defendant cannot demonstrate substantial prejudice. *United States v. Starrett*, 55 F.3d 1525, 1553 (11th Cir. 1995).

In order to determine whether there is a material variance, we examine whether sufficient evidence supports the jury's verdict that a single conspiracy

11

existed. *Richardson*, 532 F.3d at 1284. If the evidence, as viewed in the light most favorable to the government, supports the jury's determination that a single conspiracy existed, then there is not a material variance between the indictment and the evidence presented at trial. *Id.* In considering whether a jury reasonably could have found that a single conspiracy existed, it is necessary to consider the following factors: "(1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." *Id.* (quotation omitted). The common goal element is defined "as broadly as possible." *Id.* at 1285. "[C]ommon . . . means similar or substantially the same, rather than shared or coordinate." *Id.* (quotation omitted). Regarding the third prong of the test, there need not be an overlap among all of the participants, and that the co-conspirators need not know of each other in order to be involved in the same conspiracy. *Id.* at 1285-86. Moreover, "[i]f a defendant's actions facilitated the endeavors of other co-conspirators, or facilitated the venture as a whole, a single conspiracy is established." *Id.* at 1284 (quotation omitted).

Even if there is a material variance between the conspiracy charged in the indictment and the evidence presented at trial, a defendant must demonstrate that he was substantially prejudiced by this variance in order to obtain the reversal of his conviction. *Id.* at 1286. In order to demonstrate that he was substantially

prejudiced by a material variance between the indictment and the evidence presented at trial, a defendant must show either that: (1) he was unfairly surprised by the evidence presented at trial, and thus was unable to prepare an adequate defense; or (2) there were so many defendants and separate conspiracies that there was a substantial likelihood that the jury would transfer the proof of one conspiracy to a defendant involved in another conspiracy. *Id.* at 1286-87. It is the defendant's burden to demonstrate prejudice. *See United States v. Calderon*, 127 F.3d 1314, 1328 (11th Cir. 1997) (holding that, even if we were to conclude that there was a material variance, it would be "incumbent" on the defendant to demonstrate that the variance substantially prejudiced him). We have held that, where a case involved 11 defendants and 2 possible conspiracies, the case was "not so complex by definition that the jury [would] be unable to segregate the evidence properly." *United States v. Caporale*, 806 F.2d 1487, 1501 (11th Cir. 1986).

Here, viewing the evidence in the light most favorable to the government, there was sufficient evidence to permit the jury to conclude that Melendez and Goitia-Mora were involved in the single conspiracy alleged in the indictment. The evidence demonstrated that Melendez, Goitia-Mora, Montes, and their associates shared the common goal of importing cocaine from Puerto Rico into the Orlando area in order to resell it for a profit. In addition, the evidence showed that the

13

nature of the underlying scheme was substantially the same among Montes and his associates and Melendez and his associates. Both Melendez and Montes imported cocaine from Puerto Rico, albeit from different suppliers. The boxes of cocaine that Melendez and Montes received were packaged in a substantially similar manner. In addition, both Melendez and Montes hired at least one individual to arrange for the safe delivery of the cocaine packages by procuring delivery addresses and managing the individuals who took delivery of the boxes.

Finally, there was sufficient evidence of overlapping participants between the two organizations to support the jury's verdict. Melendez and Montes assisted each other by supplying each other with cocaine on a credit basis, and Goitia-Mora assisted both Melendez and Montes by carrying cocaine and money between them. Adames received cocaine on behalf of both Melendez and Montes. In addition, the evidence also showed that some of the addresses used by Melendez to receive cocaine shipments were also used by Montes for the same purpose. Thus, despite the fact that the record contained evidence that Melendez and Montes operated separate drug organizations, the jury still reasonably could have found that Melendez and Goitia-Mora were involved in a single conspiracy with Montes.

Moreover, even if we were to conclude that the jury could not have reasonably found that a single conspiracy existed, Goitia-Mora's and Melendez's

14

convictions would still be due to be affirmed because they have not demonstrated substantial prejudice. Goitia-Mora does not point to any evidence of prejudice in his brief on appeal. Melendez concedes, in his brief on appeal, that the government provided him with all of its discovery related to Montes's drug trafficking. Throughout the trial proceedings, neither Melendez nor Goitia-Mora indicated that they were unfairly surprised by the government's evidence. Rather, defense counsel for both parties thoroughly cross-examined the evidence introduced by the government, including Montes's testimony concerning his importation and distribution of drugs. While Melendez asserts that the evidence concerning Montes's threats of violence against Adames was prejudicial, defense counsel established, during cross-examination of Montes and Agent Schulte, that Melendez was not involved in this incident.

In addition, while Melendez argues that the evidence of Montes's drug-trafficking activities must have confused the jury, this case involves only 2 defendants and 2 possible conspiracies, and we have held that a case involving 11 defendants and 2 conspiracies is not so complex as to prejudice a defendant by confusing a jury. *See Caporale*, 806 F.2d at 1501. Moreover, Melendez's and Goitia-Mora's claims of prejudice are further undermined by the fact that they both focused on single-conspiracy arguments in their closing statements, and the district

15

court clearly instructed the jury that, if it found that there were multiple conspiracies instead of the single conspiracy charged in the indictment, it must acquit Melendez and Goitia-Mora. Accordingly, even if there was a material variance, Goitia-Mora and Melendez cannot demonstrate that this variance caused them substantial prejudice.

## III.

We review *de novo* the issue of whether the evidence is sufficient to support the jury's determination that individuals entered into a conspiracy. *United States v. Mercer*, 165 F.3d 1331, 1333 (11th Cir. 1999). There is a "critical distinction between a conspiratorial agreement and a buyer-seller transaction." *Id.* at 1335. In a buyer-seller relationship, the parties come to an agreement, but the agreement amounts to the mere exchange of drugs for money. *Id.* This type of transaction "is simply not probative of an agreement to join together to accomplish a criminal objective beyond that already being accomplished by the transaction." *Id.* (quotation omitted). In other words, "[w]here the buyer's purpose is merely to buy and the seller's purpose is merely to sell, and no prior or contemporaneous understanding exists between the two beyond the sales agreement, no conspiracy has been shown." *Id.* (quotation omitted).

On the other hand, a jury may infer that a conspiratorial relationship exists

16

between two parties to a drug transaction where "the evidence shows a continuing relationship that results in the repeated transfer of illegal drugs to the purchaser." *Id.* Thus, we have held that there was sufficient evidence of a conspiracy where the defendant purchased cocaine from the same supplier on a credit basis on several occasions, the supplier knew that the defendant was reselling the cocaine for a profit, and the defendant helped the supplier arrange for a shipment of cocaine. *United States v. Beasley*, 2 F.3d 1551, 1560-61 (11th Cir. 1993). This evidence demonstrated that the relationship between the supplier and the defendant was "far more than merely a buyer-seller relationship." *Id.* at 1560.

Here, the evidence showed that Melendez's and Montes's relationship went beyond that of mere buyer and seller. Montes testified that he sold cocaine to Melendez on a credit basis on anywhere between 10 to 15 occasions. During these transactions, he sold approximately 50 kilograms of cocaine to Melendez in exchange for approximately $1,000,000. Melendez also sold approximately two kilograms of cocaine to Montes on a credit basis. When discussing the price of cocaine with Montes, Melendez asked that Montes give him a discount so that Melendez could make a larger profit from the cocaine. In addition, in their telephone conversations, Melendez and Montes discussed the state of the cocaine market in general. In one conversation, Melendez offered to help Montes recover a

17

missing cocaine shipment. Because Melendez and Montes transacted in cocaine with each other on over ten occasions, supplied each other with large quantities of cocaine on a credit basis, and discussed profit margins and the state of the cocaine market in general, the jury reasonably could infer that they sold each other cocaine with the knowledge that it would be resold at a profit to other consumers. Accordingly, Melendez's argument that the district court should have granted his motion for a judgment of acquittal because he and Montes had only a buyer-seller relationship lacks merit.

**IV.**

We review a district court's failure to give a requested jury instruction for abuse of discretion. *United States v. Gomez*, 164 F.3d 1354, 1355-56 (11th Cir. 1999). The buyer-seller jury instruction is based upon the law that, where the extent of the relationship between two individuals is an agreement to buy and sell narcotics, this evidence does not demonstrate that the two individuals were in a conspiracy together. *See Beasley*, 2 F.3d at 1560-61. This instruction is not appropriate where two individuals frequently deal in large quantities of narcotics. *Gomez*, 164 F.3d at 1356.

It is unclear whether Melendez has preserved this argument properly for appeal, as the record does not include his proposed jury instructions, and the

transcript of the charge conference does not clearly indicate whether the parties discussed the buyer-seller jury instruction. In any event, we need not decide this issue because Melendez's argument lacks merit regardless of the standard of review. As discussed above, the evidence did not demonstrate that Melendez and Montes had merely a buyer-seller relationship, and, as a result, the buyer-seller jury instruction was not warranted.

**AFFIRMED.**